Chauncey STARLING, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Nos. 260 & 269, 2004.

Supreme Court of Delaware.

Submitted: May 24, 2005.
Decided: Aug. 16, 2005.

Bernard J. O'Donnell, Office of the Public Defender, Wilmington, DE, for appellant.

Paul Wallace (argued), Thomas E. Brown, Elizabeth R. McFarland and Gregory E. Smith, Department of Justice, Wilmington, DE, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en banc.

STEELE, Chief Justice:

In October 2003, a Superior Court jury convicted Chauncey S. Starling of first-degree murder and other offenses. The same jury, after a post-trial penalty hearing, recommended that Starling be executed. The trial judge agreed and imposed a death sentence. Starling now appeals, alleging eight procedural and constitutional defects in the voir dire, trial, and penalty phases of the proceedings. For the reasons discussed below, we find that the trial judge acted within his discretion, and did not otherwise err, during jury selection, during the guilt phase, or while instructing the jury at the penalty phase. We therefore affirm those aspects of Starling's trial. But because the trial judge recited in his sentencing opinion that he was "directed" to give "great weight" to the jury's recommendation in his sentencing decision, contrary to the strictures of Delaware's death-penalty statute, we vacate Starling's sentence and remand for reconsideration under the appropriate standard as outlined in this Opinion.

## I. BACKGROUND

In March 2001, a gunman shot and killed Darnell Evans and five-year-old Damon Gist Jr. on West Fourth Street in Wilmington. After arriving at the scene, Wilmington police interviewed witnesses to the shooting. Although the witnesses provided a physical description of the shooter, none could identify him by name. Several weeks later, a newly discovered witness, Alfred Gaines, indicated to police that he observed the shootings. Gaines identified Starling as the gunman who shot Evans and Gist.

Acting on this information, Wilmington police interviewed Starling's brother, Michael. In an April 2001 recorded statement, Michael claimed that Starling admitted that he "messed up" and was "sorry about the kid." Police also interviewed Starling's girlfriend, Vickie Miller, who denied that Starling admitted anything to her or that she saw Starling on the night of the shootings. Shortly thereafter, Wilmington police arrested Starling.

Trial proceedings began in Superior Court in October 2003. During jury selection, the trial judge asked prospective jurors whether they were predisposed to a particular sentence—either life imprisonment or death—without regard for any aggravating or mitigating factors that may exist. The trial judge excused some members of the venire who stated they would automatically recommend a life sentence. The State, through several peremptory challenges, also sought to exclude three female venire members. Starling objected to these challenges, claiming they were motivated by gender discrimination. Citing the State's gender-neutral explanations, the trial judge overruled Starling's objections.

At trial, Gaines recounted the incidents surrounding the shooting and identified Starling as the shooter. Gaines also testified that, on the night of the shooting, Starling admitted to Michael, Miller, and Gaines that he shot a child. Although Michael's recorded statement corroborated Gaines's testimony, Michael later denied that Starling made any admissions.

To lay a foundation for admitting Michael's recorded statement, the State called Wilmington Police Detective Patrick Conner. In response to questioning about whether he was present during Michael's statement, Detective Conner revealed that he had interviewed Starling. Starling objected, claiming that Conner's testimony compromised Starling's Fifth Amendment right to silence because it created a negative inference concerning his decision to exercise that right. In response, the trial judge instructed the jury to disregard the reference to Starling's statement. Following trial, the jury found Starling guilty on two counts of first-degree Murder, two counts of Possession of a Firearm During the Commission of a Felony, and one count of first-degree Conspiracy.[1]

Following the verdict, Starling moved for a new trial on two grounds. First, Starling renewed his contention that Conner's statement violated Starling's right to remain silent. Second, Starling argued that the State was required to but did not disclose the Wilmington Police interview of Vickie Miller, which was exculpatory because it could have impeached Gaines's testimony.

In an April 2004 opinion, the trial judge denied Starling's motion.[2] On the first issue, the trial judge found that Conner's statement did not reveal any aspect of the dialogue between the police and Starling or provide the basis for reasonable implication that Starling had invoked his right to remain silent.[3] Rather, according to the trial judge, the statement indicated only that the police interviewed Starling. On the second issue, the trial judge found that Miller's statement was not exculpatory,

and, therefore, need not have been disclosed because Miller never actually contradicted Gaines's account of the shooting.[4]

Starling's trial then moved to the penalty phase. The parties agreed that the jury would consider three statutory aggravating factors: (1) the defendant was previously convicted of a felony involving the use or threat of force or violence on another person; (2) the defendant's course of conduct resulted in the deaths of two or more persons and the deaths were the probable consequence of the defendant's conduct; and (3) the victim was a child fourteen years of age or younger, and the murder was committed by an individual who was at least four years older than the victim.[5] The parties presented evidence over a three-day period, during which the State called three witnesses to give victim-impact statements.

After hearing the evidence, the sentencing judge instructed the jury, stating that although the jury's role was "vital" and their recommendation was an "important factor" in sentencing, their recommendation ultimately did not bind him. Next, the trial judge instructed the jury on the statutory aggravating factors, stating that a unanimous finding of at least one statutory aggravating factor beyond a reasonable doubt made Starling eligible for the death penalty. Finally, the trial judge listed the stipulated aggravating and mitigating factors, instructing the jurors to weigh the aggravating and mitigating factors when deciding between life imprisonment and death. Following deliberations, the jury unanimously found that the evidence supported all three statutory aggravating

1. *State v. Starling*, Del.Super., ID No. 0104015882 (Oct. 22, 2003).

2. *Starling*, ID No. 0104015882 (April 26, 2004) (Mem. Op.).

3. *Id.* at 16.

4. *Id.* at 21.

5. *See* 11 *Del. C.* § 4209(e)(1)(i), (k), (s).

factors and recommended the death penalty.

In a June 2004 sentencing decision, the trial judge, after considering the aggravating and mitigating circumstances, found that the jury's recommendation was "supported by the record and not irrational." [6] Citing our decision in *Garden v. State*,[7] the trial judge stated that he was "directed to give this [jury] recommendation great weight" and that the jury's "recommendation is most appropriate under the circumstances." [8] Lastly, weighing all of the evidence provided and considering the jury's recommendation, the trial judge found, by a preponderance of the evidence, that the aggravating circumstances outweighed the mitigating circumstances. Accordingly, the trial judge sentenced Starling to death. This is Starling's appeal.

## II. STARLING'S CONTENTIONS

### A. Death Qualification

■ Starling first argues that the exclusion of members of the venire based on their predisposition toward life-imprisonment, known as creating a "death-qualified jury," deprived him of his right to a jury that serves as the conscience of the community.[9] Starling claims that, because the jury's recommendation is only advisory, the trial judge mistakenly required a death-qualified jury.[10] We review a trial judge's voir dire examination of potential jurors for abuse of discretion.[11]

The trial judge asked perspective jurors if they could, under the appropriate circumstances, impose a death sentence and excused any juror who categorically could not impose the death penalty. Starling posits, in an attempt to distinguish this Court's precedent, that the General Assembly has mooted the death-qualification requirement in recent amendments to the death-penalty statute that created, for the first time, an advisory jury recommendation. According to Starling, a death-qualified jury is no longer required.

■ In 2003, the General Assembly amended the death-penalty statute to permit a sentencing judge to give the jury's sentencing recommendation "such consideration as deemed appropriate by the court ...." [12] Delaware's death-penalty statute, however, required an advisory jury finding well before 2003.[13] Rather

---

6. *State v. Starling*, ID No. 0104015882 (June 10, 2004) (Sentencing Decision at 27).

7. 844 A.2d 311, 313–14 (Del.2004), *reaffirming Garden v. State*, 815 A.2d 327, 343 (Del. 2003).

8. *Starling*, ID No. 0104015882 (Sent. Dec. at 27).

9. *See State v. Cohen*, 604 A.2d 846, 856 (Del. 1992) (describing jury's role in death-penalty sentencing as the conscience of the community).

10. Alternatively, Starling claims that death-qualified juries operate to exclude racial minorities from the jury pool and thus deprive defendants, in the abstract, of the protections of a fairly-drawn jury. Although he cites several empirical studies in the law review literature, Starling does not address how the

studies' findings relate to the jury actually selected. In the absence of any evidence or analysis in the briefs that the voir dire process in this case prejudiced Starling or otherwise tainted the verdict, we decline to address the merits of this claim.

11. *Ortiz v. State*, 869 A.2d 285, 292 (Del. 2005).

12. 74 Del. Laws ch. 174 §§ 1, 2 (July 15, 2003), *codified at* 11 *Del. C.* § 4209(d).

13. *See* 11 *Del C.* § 4209(d)(1) (1991) ("A sentence of death shall be imposed, after considering *the recommendation of the jury*, if a jury is impaneled, if the Court finds ....") (emphasis added). *See also Wright v. State*, 633 A.2d 329, 335 (Del.1993) (interpreting Section 4209(d) to require advisory jury recommendation).

than changing the jury's advisory role, the 2003 amendments, in this context, only clarified the weight a trial judge may give to a jury's recommendation.

The text of the death-penalty statute's earlier version refutes Starling's contention that the 2003 amendment eliminated the requirement of a death-qualified jury by creating an advisory jury recommendation. As a result, Starling cannot identify any fundamental change in the jury's sentencing role that warrants an abolition of the death-qualification requirement. We therefore find that the trial judge did not abuse his discretion during voir dire by requiring a death-qualified jury.

### B. Jury Selection

■ Starling next asserts that the trial judge abused his discretion by overruling his objection to the State's use of peremptory challenges during jury selection. Specifically, Starling contends that, by excluding a pregnant member of the venire, the trial judge violated Starling's Fourteenth Amendment right to equal protection by permitting the State to exercise a gender-motivated peremptory challenge. We review a trial judge's ruling on a peremptory challenge for abuse of discretion.[14]

■ In *J.E.B. v. Alabama ex rel. T.B.*, the United States Supreme Court prohibited, on equal protection grounds, the use of gender-based peremptory challenges.[15] Here, however, the State's challenge is not gender-based, because the State cited the pregnancy and the ill effects of stress at trial to justify its challenge. A prospective

juror's particular physiological state at the time of jury selection may be wholly unrelated to matters of gender. Accordingly, because the State's peremptory challenge was not based on gender, we find no abuse of discretion.

■ Starling also contends that inaccuracies in the transcript of jury selection prevented him from adequately preparing an appeal, and, as a result, require a new trial or an accurate reconstruction of the record. We review a claim that inaccuracies in a transcript warrant a new trial to determine whether the errors complained of deprive a defendant of meaningful appellate review or the effective assistance of counsel on appeal.[16]

■ Starling questions the accuracy of several exchanges between the trial judge and three members of the venire. Starling fails, however, to articulate how any discrepancy in the transcript unfairly prejudiced his ability to raise pertinent legal errors on appeal. Starling made no effort to correct those alleged inaccuracies. In the absence of any demonstrated prejudice, Starling's claim lacks merit.

■ Starling's next contention that the trial judge improperly refused to excuse two members of the venire for cause because they were biased in favor of the State is equally without merit because these jurors were never seated. The trial judge's failure to excuse two prospective jurors who were never seated could not constitute an abuse of discretion.

---

14. *See Gattis v. State,* 697 A.2d 1174, 1184 (Del.1997).

15. 511 U.S. 127, 146, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) ("[T]he Equal Protection Clause prohibits discrimination in jury selection on the basis of gender, or on the assump-

tion that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man.").

16. *See Ross v. State,* 482 A.2d 727, 735 (Del. 1984).

## C. Detective Conner's Statement

■ Starling next argues that the admission of Detective Conner's statement at trial violated his Fifth Amendment right to remain silent by creating in the jury's mind a negative inference from Starling's decision to exercise that right. Starling claims that the trial judge committed reversible error by failing to order a mistrial after Conner revealed on the witness stand that he had attempted to interview Starling. We review a trial judge's denial of a motion for a mistrial for abuse of discretion.[17]

■ At trial, the State asked Conner if he was present while Michael gave his statement. Answering no, Conner stated that he was instead interviewing Starling at the time. Starling objected to Conner's testimony, claiming that the statement violated his right to remain silent and therefore warranted a mistrial. The trial judge denied Starling's motion, but *sua sponte* instructed the jurors to disregard Conner's reference to Starling. After Starling renewed this claim in a postverdict motion for a mistrial, the trial judge again denied Starling's motion, holding that Conner's testimony did not reasonably imply to the jury that Starling had invoked his Fifth Amendment rights.

■ A mistrial is warranted where a defendant suffers "egregious" prejudice that cannot be remedied by a curative instruction.[18] Thus, a mistrial is "mandated where there are no meaningful and practical alternatives to that remedy."[19] In conducting our review, we recognize that trial judges are "in the best position to assess whether a mistrial should be granted."[20]

The trial judge applied the *Hughes v. State* three-part harmless error analysis to determine if the statement incurably prejudiced the jury.[21] Finding that Conner's testimony failed to satisfy any of the three-part *Hughes* test, the trial judge determined that the statement's introduction constituted harmless error.[22]

We agree. If Conner's testimony created prejudice that rendered all curative measures inadequate, a mistrial would be the appropriate remedy. But Starling's right-to-remain-silent claim, while addressing potential negative implications in the abstract, fails to address the remedial effects of the trial judge's curative instruction. Although Conner referred to Starling by name, he did not reveal any details about Starling's conduct or anything said during the attempted interrogation that could give rise to an uncontestable negative inference. In the absence of any indication that Conner's testimony irrevocably unfairly prejudiced Starling before the jury, we find that the trial judge's curative instruction effectively neutralized any potential prejudice to Starling that the jury may have inferred. Accordingly, we find no abuse of discretion.

17. *Taylor v. State*, 827 A.2d 24, 27 (Del.2003).

18. *Ashley v. State*, 798 A.2d 1019, 1022 (Del. 2002).

19. *Dawson v. State*, 637 A.2d 57, 62 (Del. 1994), *quoting Bailey v. State*, 521 A.2d 1069, 1077 (Del.1987) (quotation marks omitted).

20. *Bowe v. State*, 514 A.2d 408, 410 (Del. 1986).

21. 437 A.2d 559, 571 (Del.1981) (holding that extent of prejudice is assessed by considering the centrality of the issue affected by the alleged error, the closeness of the case, and the steps taken to mitigate the effects of the alleged errors). *See also Zimmerman v. State*, 628 A.2d 62, 65 (Del.1993) (applying *Hughes* test to context of motions for mistrial).

22. *State v. Starling*, ID No. 0104015882 (April 26, 2004) (Mem. Op. at 16).

### D. Failure to Disclose Exculpatory Evidence

 Starling further claims that the trial judge abused his discretion by denying Starling's motion for a new trial based on the State's failure to disclose exculpatory evidence. Specifically, Starling argues that the State's failure to disclose the Wilmington police interview of Vickie Miller violated the due process protections outlined by the United States Supreme Court in *Brady v. Maryland.*[23] Starling maintains that Miller's statement could have been used to impeach Gaines's testimony, and that by withholding this evidence, the State violated *Brady,* warranting a new trial. We review a claim that the State failed to disclose exculpatory evidence *de novo.*[24]

 There are three components of a *Brady* violation: (1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the State; and (3) its suppression prejudices the defendant.[25] The State's failure to disclose exculpatory evidence, however, does not, alone and without more, constitute a *Brady* violation.[26] The State must release evidence only when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[27]

Here, Starling fails to show how the withheld evidence materially affected the verdict. Miller's statement indicated only that she could not remember seeing Starling on the night of the shooting. Michael's initial statement, on the other hand, corroborated Gaines's testimony about Starling's admissions. With this corroboration of Gaines's testimony, the failure to disclose Miller's (at most) ambiguous statement to Starling hardly "undermines confidence in the outcome of [Starling's] trial."[28] We therefore find no reversible error.

### E. Constitutionality of Delaware's Death–Sentence Statute

 Starling next contends that Delaware's death-penalty statute violates his Sixth Amendment right to a jury trial by permitting a judge, rather than a jury, to determine whether the aggravating factors outweigh the mitigating factors. Starling claims that because this determination may lead to increased punishment, it operates as an element of the offense and therefore must be found by a jury beyond a reasonable doubt. We review a statute's constitutionality *de novo.*[29]

The Delaware death-penalty statute requires that the jury find the existence of at least one statutorily-defined aggravating factor unanimously and beyond a reasonable doubt before the defendant becomes eligible for the death penalty.[30] If the jury

**23.** 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

**24.** *See Cabrera v. State,* 840 A.2d 1256, 1268–69 (Del.2004).

**25.** *Strickler v. Greene,* 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

**26.** *See id. See also Brady,* 373 U.S. at 83, 83 S.Ct. 1194 (requiring materiality).

**27.** *Jackson v. State,* 770 A.2d 506, 516 (Del. 2001) (citation omitted).

**28.** *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

**29.** *Thomas v. State,* 725 A.2d 424, 427 (Del. 1999).

**30.** *See* 11 *Del. C.* § 4209(d)(1).

does not find the existence of at least one statutorily defined aggravating factor unanimously and beyond a reasonable doubt, the sentencing judge retains no discretionary role and the defendant may not be sentenced to death.[31] But if the jury finds at least one statutory aggravating factor, then the sentencing judge must determine if all of the aggravating factors outweigh the mitigating factors by a preponderance of the evidence before a death sentence can be imposed.[32] The jury makes a recommendation on the sentence, but the sentencing judge need only give such consideration as it deems appropriate to the jury's sentencing recommendation.[33]

Starling's claim that the sentencing statute is unconstitutional under *Ring v. Arizona*[34] is not novel. We responded to the same argument made here in *Ortiz v. State*,[35] a case which reiterated our earlier holding in *Brice v. State*.[36] This Court has repeatedly held that the Delaware sentencing statute is constitutional under *Ring*.

In *Ring* and a companion case, *Apprendi v. New Jersey*,[37] the United States Supreme Court forbade a sentencing judge from enhancing a statutory penalty based on specific facts without a finding by the jury that the facts underlying the enhanced penalty had been proved beyond a reasonable doubt.[38] In Delaware, however-

er, the sentencing judge does not enhance the sentence under the Delaware statute. As we have stated:

> Although a judge cannot sentence a defendant to death without finding that the aggravating factors outweigh the mitigating factors, it is not that determination that increases the maximum punishment. Rather, the maximum punishment is increased by the [jury's unanimous] finding [beyond a reasonable doubt] of the statutory aggravator. At that point a judge can sentence a defendant to death, but only if the judge finds that the aggravating factors outweigh the mitigator [sic] factors. Therefore, the weighing of aggravating circumstances against mitigating circumstances does not increase the punishment. Rather, it ensures that the punishment imposed is appropriate and proportional.[39]

Accordingly, the Sixth Amendment, as applied *through Ring* and *Apprendi*, permits the dual-scheme established by Delaware's sentencing statute. We therefore find Starling's claims to the contrary to be without merit.

### F. Sentencing Decision

 Starling also claims, for the first time on appeal, that the trial judge erred by instructing the jury that it must find at

---

31. *Id.*

32. *Id.*

33. *Id.*

34. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

35. 869 A.2d 285, 305 (Del.2005).

36. 815 A.2d 314, 321–22 (Del.2003).

37. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

38. *See Ring*, 536 U.S. at 609, 122 S.Ct. 2428 (2002) (holding that where "enumerated ag-

gravating factors operate as the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury") (citation and quotation marks omitted); *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

39. *Ortiz*, 869 A.2d at 305, *citing Brice*, 815 A.2d at 322.

least one statutory aggravating circumstance, and that a victim-impact statement introduced at the penalty phase impermissibly invited a jury recommendation based on emotion, rather than reason. We review these claims for plain error.[40]

### 1. Aggravating Circumstances

■ During the penalty phase, the trial judge instructed the jury that they must find, based on their verdict, that Starling's "course of conduct resulted in the deaths of two or more persons where the deaths are a probable consequence of the defendant's conduct."[41] Starling argues that the jury's finding of guilt on the two counts of murder does not automatically warrant a finding of this statutory aggravating factor beyond a reasonable doubt. Our precedent, however, instructs otherwise. As we said in *Reyes v. State*:

> When the very nature of a jury's guilty verdict simultaneously establishes the statutory aggravating circumstance set forth under Section 4209(e)(1)(k), that jury verdict authorizes a maximum punishment of death in a manner that comports with the United States Supreme Court's holding in *Ring*.[42]

Although we decided this issue in the context of the 1991 death-penalty statute, Starling is unable to distinguish that precedent based on the current statute, which retains the identical statutory aggravating circumstance.[43] We therefore find no plain error in the trial judge's instructions to the jury.

### 2. Victim–Impact Evidence

■ Starling's second claim of error during the penalty phase involves the victim-impact statements given by both Evans's wife and his extra-marital girlfriend, and those given by Gist's mother and grandmother. Despite the trial judge's limiting instruction, Starling asserts that a prosecutor's ill-advised sidebar comment— "these folks had to sit there sobbing on the stand to accommodate Mr. Starling"—indicates that the jury's findings at the penalty phase were based on emotion, rather than reason. Starling maintains that, as a result, he was deprived of a fair sentencing recommendation.

■ We recognize that during the penalty phase of trial excessive displays of emotion, uncontrolled by the trial judge, may create prejudice that effectively denies a defendant a fair hearing before a jury's sentencing recommendation.[44] Starling's reference to an isolated comment by the prosecutor, made outside the presence of the jury, illustrates that the witnesses exhibited emotion while testifying. As Starling concedes, however, the transcript of their actual testimony reveals no excessive emotional display. Where a display of emotion is reasonable—that is, does not overwhelm the other evidence or otherwise prompt the jury to irrationally balance the aggravating and mitigating circumstances—during a victim-impact hearing, a limiting instruction reminding the jury that sympathy for the victims and their families should not influence their sentenc-

---

**40.** *See* Sup. Ct. R. 8.

**41.** 11 *Del. C.* § 4209(e)(1)(k).

**42.** 819 A.2d 305, 317 (Del.2003).

**43.** *Cf. Cabrera v. State*, 840 A.2d 1256, 1273 (Del.2004) ("Because the jury had to find, unanimously and beyond a reasonable doubt, that Cabrera's conduct resulted in the deaths of two people and that the deaths were the

probable consequence of his conduct in order to convict Cabrera of the charges against him, *Ring* is satisfied here as it was in *Swan*.").

**44.** *Cf. Norcross v. State*, 816 A.2d 757, 765–66 (Del.2003) (holding that, despite emotional nature of testimony presented, trial judge properly assessed it in context of other evidence).

ing decision, defuses any potential prejudice. Because the trial judge gave the appropriate instruction here, we find no plain error.

### 3. Sentencing Decision

■ Starling finally contends that the trial judge erroneously afforded "great weight" to the jury's recommendation of death. Starling argues that, by applying the improper standard of deference, the trial judge committed reversible error. We review a trial judge's sentencing decision to ensure that it is "the product of a deliberate, rational, and logical deductive process" and that the trial judge imposed the sentence neither arbitrarily nor capriciously.[45]

While instructing the jury, the trial judge correctly indicated that although the jury's role was "vital" and their recommendation was an "important factor" in sentencing, he was not ultimately bound by their recommendation. In his sentencing decision, however, the trial judge stated that our decision in *Garden v. State*[46] "directed" him to give "great weight" to the jury's recommendation.[47]

■ In *Garden*, we held that trial judges must afford "great weight" to a jury's recommendation of a life sentence.[48] After that decision, however, the General Assembly amended the death-penalty statute to provide that:[49]

The jury's recommendation concerning whether the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist *shall be given such consideration as deemed appropriate by the Court* in light of the particular circumstances or details of the commission of the offense and the character and propensities of the offender as found to exist by the Court. The jury's recommendation shall not be binding upon the Court.[50]

The new statute's requirement that a sentencing judge "giv[e] such consideration as deemed appropriate" thus allows the trial judge to decide the weight the jury's recommendation should be given.[51] Accordingly, *Garden* no longer serves as precedent for the appropriate level of deference a sentencing judge must afford the jury's sentencing recommendation.

■ Despite properly instructing the jury on the deference afforded to their recommendation, the trial judge implied that he relied on *Garden* and that he, indeed, was "directed to give this [jury] recommendation great weight" in his sentencing decision. While the sentencing judge may choose to do so on the particular facts before the Court, he erred as a matter of law by stating that he was "directed" to give the recommendation great weight. Consequently, the sentence must

---

45. *Ortiz*, 869 A.2d at 310 (deductive-process review); 11 *Del. C.* § 4209(g)(2) (arbitrary-and-capricious review).

46. 844 A.2d 311, 313–14 (Del.2004).

47. *Starling*, ID No. 0104015882 (Sentencing Dec. at 27).

48. 844 A.2d at 314.

49. *See* 74 Del. Laws ch. 174 (July 15, 2003) (Synopsis, H.B. 287) ("This Act will reverse the Delaware Supreme Court's judicial misinterpretation of Delaware's death-penalty statute by repealing the *Tedder* standard adopted

by the Supreme Court in *Garden*."), *available at* 2003 Del. ALS 174 (Lexis).

50. 11 *Del. C.* § 4209(d)(1) (emphasis added).

51. *See* Synopsis, 2003 Del. ALS 174 ("'[This amendment] will clarify that it is and has been the intent of the General Assembly that ... [a sentencing judge] shall not be bound by the [jury's] recommendation, but instead shall give it such weight as he or she deems appropriate under the circumstances present in a given case.'").

be vacated. But because the trial judge instructed the jury on the correct standard, and the error occurred after the jury made its recommendation, the error's effects are limited solely to the trial judge's final sentencing decision, and do not affect the jury's findings. We therefore remand to the Superior Court for the limited purpose of resentencing under the appropriate standard articulated in 11 *Del. C.* § 4209(d).

### III. CONCLUSION

For these reasons, the judgment of the Superior Court sentencing Starling to death is **VACATED**. We **REMAND** for resentencing under the appropriate standard consistent with this Opinion. The judgments of guilt based on the jury's verdict and the jury's sentencing recommendation are otherwise **AFFIRMED**.