# IN THE SUPREME COURT OF THE STATE OF DELAWARE

BRIAN WILSON, §
§ No. 201, 2020
    Defendant Below, §
    Appellant, § Court Below: Superior Court
§ of the State of Delaware
    v. §
§ Cr. ID No. N1901009072
STATE OF DELAWARE, §
§
    Plaintiff Below, §
    Appellee. §

Submitted: November 10, 2021
Decided: January 25, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting this Court *en Banc*.

Upon appeal from the Superior Court of the State of Delaware: **AFFIRMED**.

Zachary A. George, Esquire (*argued*), Hudson Jones Jaywork & Fisher, Dover, Delaware, and Anthony A. Figliola, Jr., Esquire, Greto Law, Wilmington, Delaware, *for Defendant Below, Appellant Brian Wilson*.

Elizabeth R. McFarlan, Esquire (*argued*), Delaware Department of Justice, Wilmington, Delaware, *for Plaintiff Below, Appellee State of Delaware*.

**SEITZ**, Chief Justice:

A Superior Court jury convicted Brian Wilson of first-degree murder for hiring someone to kill Allen Cannon. On appeal, Wilson raises three claims of error—first, the court abused its discretion when it refused to allow testimony about a witness's reputation as a snitch introduced to counter the witness's incriminatory statement about Wilson and the murder; second, the court erred when it overruled a hearsay objection and admitted text messages that infer Wilson was the person responsible for Cannon's murder; and third, the State committed a *Brady* violation when it failed to disclose a witness's agreement with federal prosecutors to testify in Wilson's trial in exchange for a possible lighter sentence.

We affirm Wilson's convictions. The testimony about the witness's reputation as a prison snitch was inadmissible character evidence not subject to any exceptions. And while the State concedes that the text messages were inadmissible, the Superior Court's error in admitting them was harmless. Finally, we agree with the Superior Court that the impeachment evidence resulting from the alleged *Brady* violation was immaterial and does not undermine confidence in the verdict given the witness's favorable testimony for the defense and the other evidence supporting Wilson's convictions beyond a reasonable doubt.

## I.

According to the evidence at trial, in the early hours of June 25, 2016, an unidentified individual called 911 to complain about people gambling in front of her neighbor's house. When a Wilmington Police Department detective arrived, the group scattered. They were involved in a high stakes dice game, and Wilson was part of this game with $10,000 in his pockets. Before the game, Cannon asked Artie Pratt to steal the money from Wilson. Wilson owed Cannon money, and Cannon wanted to collect. Pratt attempted to take the money at the dice game but was unsuccessful.

Wilson, frustrated that Cannon and Pratt tried to rob him, hired someone to kill Cannon. Sometime between the dice game and the next morning, Wilson contacted Robert Shepard and asked if Shepard knew someone "that wanted to put some work in[.]"[1] Shepard later testified this meant he was looking to hire someone to kill Cannon. Shepard told him he did not know anyone. Wilson contacted another man named Robert Teat, also known as Bobby Dimes, and asked the same question. Dimes arranged for an associate, Eric Ray, to kill Cannon for $10,000.

The evening after the dice game, Cannon was in a car near the location of the dice game. Tomika Tate, Pratt's mother, saw Cannon crying in the car. She walked over and asked Cannon to leave with her. Cannon got out of the car but said he was

---

[1] App. to Opening Br. at A72–73.

3

waiting for something and could not leave. About ten to fifteen minutes later, someone fatally shot Cannon from behind. Tate was standing next to Cannon, so close that she fell to the ground when the gunshots started. Tate testified that Ray was the one who shot Cannon. Testimony and footage from security cameras showed that Dimes and Ray were standing around the scene of the shooting before it occurred, and Dimes was at the scene immediately after.

In January of 2019, a New Castle County grand jury indicted Wilson for murder first-degree, conspiracy first-degree, and criminal solicitation first-degree. At trial, Wilson denied any involvement in the dice game or Cannon's murder. The State offered as witnesses several inmates who testified that Wilson told them that he had ordered Cannon's murder. One of the witnesses was Timothy Keyes.

Keyes made a statement to Sergeant Robert Fox of the Wilmington Police Department three weeks before Wilson's trial. Keyes said Wilson admitted he had arranged Cannon's murder by having Dimes hire Ray to kill Cannon in retaliation for the attempted theft. But when the State called Keyes to testify at Wilson's trial, he was uncooperative. He did not comply with a subpoena, and only appeared as a witness after being served with a warrant. At trial, Keyes said he had not been promised anything in exchange for his testimony.[2] He then directly contradicted his prior statement to Sergeant Fox, stating "I don't know anything about—[Wilson]

---

[2] *Id.* at A54–55.

4

never expressed anything to me about his case."[3] Keyes also said his prior statement to Sergeant Fox was based on what he read in the papers.[4] As a result, the State introduced Keyes' prior statement to demonstrate that Keyes' story had changed dramatically.[5]

Wilson's counsel then attempted to introduce character evidence through the testimony of Thomas Wisher. Wilson's counsel asked Wisher, who had been in prison with Keyes, about Keyes' reputation. The State objected on the grounds that Wisher would testify that other people in prison viewed Keyes as a snitch, and this would be inadmissible hearsay and improper character evidence. The trial court sustained the objection.[6]

The State also offered text messages from Pratt's cell phone relevant to Wilson's guilt. Wilson's counsel objected, arguing that, because Pratt was unavailable to testify, the text messages were inadmissible hearsay. The State claimed they were admissible under the business records exception to the rule against hearsay. The Superior Court agreed and admitted the text messages.[7]

The jury found Wilson guilty of all charges. The Superior Court sentenced him to a mandatory life sentence at Level V for the murder charge, along with

---

[3] *Id.* at A57.
[4] *Id.* at A56.
[5] *Id.* at A57–60. The statement was introduced as a prior, voluntary, out-of-court statement under 11 *Del. C.* § 3507.
[6] *Id.* at A76–77.
[7] *Id.* at A38; App. to Answering Br. at B31–32; B92.

additional Level V time for the remaining charges.[8]  Wilson timely appealed his conviction.

Shortly after filing an appeal, new information came to light.  On October 21, 2020, the United States Attorney's Office for the District of Delaware informed the State that an Assistant United States Attorney told Keyes the Office would consider his cooperation in Wilson's case when recommending a sentence for federal charges. The State informed Wilson's counsel, and the parties sought a stay of Wilson's appeal and a remand to the Superior Court to consider the implications under *Brady v. Maryland*,[9] which we granted.

On remand, Wilson moved for a new trial or dismissal on the basis that the State's failure to disclose the offer to Keyes was a *Brady* violation.  The Superior Court held that, while the offer was evidence that could be used to impeach Keyes, no *Brady* violation occurred because the State did not suppress the evidence.[10]  It also found that the State was not aware of the offer until October 2020 and the State disclosed the evidence as soon as it learned of it.[11]

The court also ruled that, even if the U.S. Attorney's Office offer should have been disclosed to the defense, it was immaterial as impeachment evidence.[12]  Keyes'

---

[8] *State v. Wilson*, 2021 WL 1056769 at *1 (Del. Super. Mar. 19, 2021).
[9] 373 U.S. 83 (1963).
[10] 2021 WL 1056769 at *3.
[11] *Id.*
[12] *Id.* at *3–5.

testimony at trial contradicting his statement to Sergeant Fox was helpful to the defense and impeachment of his prior statement to Sergeant Fox was unnecessary and counterproductive.[13]  Finally, the court ruled that, even if the offer should have been disclosed to the defense before trial, the other evidence at trial strongly supported Wilson's convictions.[14]

## II.

On appeal, Wilson challenges two of the Superior Court's evidentiary rulings and raises a constitutional claim.  We review a trial court's evidentiary rulings for abuse of discretion,[15] and we review constitutional claims *de novo*.[16]

## A.

Wilson argues first that the Superior Court abused its discretion when it sustained the objection to the admission of Wisher's testimony.  He contends that Wisher's testimony was admissible character evidence because Keyes' character for truthfulness became relevant when the State introduced Keyes' prior statement.  According to Wilson, the testimony that Keyes was viewed among prison inmates as a snitch would show that Keyes has a reputation for untruthfulness and call into question the credibility of his prior statement.

---

[13] *Id.* at *5.
[14] *Id.* at *6.
[15] *Edwards v. State*, 925 A.2d 1281, 1284 (Del. 2007).
[16] *Waters v. State*, 242 A.3d 778, 782 (Del. 2020).

7

The State counters that, because the testimony was based on what Wisher heard from inmates that were not testifying, it was inadmissible hearsay. The State also argues that Wisher's testimony does not show that Keyes has a character for untruthfulness. At most, a reputation as a snitch demonstrates that the witness is willing to cooperate with the State.

Character evidence is generally inadmissible, but "[e]vidence of a witness's character may be admitted under [Delaware Rules of Evidence] 607, 608, and 609."[17] Rule 608 provides that a witness's credibility may be attacked "by testimony about the witness's reputation for having a character for truthfulness or untruthfulness," but "only after the witness's character for truthfulness has been attacked."[18]

Even if we accept that Keyes' character for truthfulness had been attacked by the State when it introduced Keyes' prior inconsistent statement, Wilson has failed to show that Wisher's testimony relates to Keyes' character for truthfulness. A "snitch" in this context is an inmate who informs the government of what other inmates have said or done, usually in exchange for preferential treatment. But a snitch is not necessarily an untruthful person.

---

[17] D.R.E. 404.
[18] D.R.E. 608.

The distinction was made clear in the Ohio case *State v. Spence*.[19]  There, the defense offered testimony that the prosecution's witness had a reputation as a prison snitch.  The Court of Appeals of Ohio held that this testimony was inadmissible character evidence to impeach a witness's credibility because it would require the court to "accept the notion that cooperation with authorities in the criminal prosecution of fellow inmates equates to being untruthful."[20]

We agree with this reasoning.  A reputation as a snitch could arise because an inmate truthfully informs the government of what other inmates say.  While other inmates might not tell that individual the truth, this does not mean that the inmate is an untruthful person, just that he cannot be trusted to withhold incriminating information from the government.  Because Wisher's testimony would have shown only that Keyes had a reputation as a snitch and this does not directly relate to Keyes' character for truthfulness, the Superior Court did not abuse its discretion when it refused to admit the testimony.

## B.

Next, Wilson argues that the Superior Court abused its discretion when it admitted text messages between Pratt and another person under the business records

---

[19] 2006 WL 3438668 at *11 (Ohio Ct. App. Nov. 30, 2006).
[20] *Id.* at *12.  The court in *Spence* relied on Rule 608 of the Ohio Rules of Evidence to reach this conclusion.  Both D.R.E. 608 and Rule 608 of the Ohio Rules of Evidence are identical to Federal Rule of Evidence 608.

exception to the evidentiary rule against admission of hearsay.[21] The State concedes that the text messages should not have been admitted under this exception.[22] While the error is clear, we find that it was harmless.

We have held that "[a]n error in admitting evidence may be deemed 'harmless' when 'the evidence exclusive of the improperly admitted evidence is sufficient to sustain a conviction . . . .'"[23] Here, the other evidence is extensive, and supports Wilson's conviction. At trial, Tate confirmed the illegal dice game that night, and that Cannon and Pratt tried to rob Wilson at the game.[24] Shepard testified that Cannon and Pratt tried to rob Wilson, that Wilson was upset about the attempted robbery and wanted to retaliate, and that Wilson asked Shepard if he knew someone Wilson could hire to kill Cannon.[25] The State also presented evidence of extensive contacts between Wilson and Dimes, and Dimes and Ray.[26] Additionally, the State offered security camera footage showing that Dimes and Ray were near the scene of the crime immediately before the murder occurred.[27] Tate testified that she was standing next to Cannon when he was shot,[28] and that Ray was the one who shot

---

[21] D.R.E. 803(6). Neither individual testified at trial.

[22] Answering Br. at 18 ("The State acknowledges that the text messages were not admissible pursuant to DRE 803(6), the business record exception to the rule against hearsay.").

[23] *Capano v. State*, 781 A.2d 556, 597 (Del. 2001) (quoting *Nelson v. State*, 628 A.2d 69, 77 (Del. 1993)).

[24] App. to Answering Br. at B24–26.

[25] App. to Opening Br. at A70–73.

[26] App. to Answering Br. at B105–07.

[27] *Id.* at B12–13.

[28] *Id.* at B22–23.

Cannon.[29] The State also offered admissible text messages from Dimes' phone sent the day after Cannon's murder that include a picture of Dimes holding a large amount of cash.[30] There was also testimony from other inmates who heard Wilson admit he hired Dimes and Ray to kill Cannon.[31] Finally, Tate testified that she sent Pratt to North Carolina out of fear for Pratt's life.[32] Because this evidence was more than sufficient to sustain Wilson's conviction, the court's admission of the text messages was harmless error.

## C.

Finally, we address Wilson's argument that the State improperly suppressed material impeachment evidence in violation of *Brady v. Maryland*.[33] He claims the Superior Court erred because the State was aware of the offer to Keyes by the federal government weeks before Wilson's trial and failed to disclose it. He also argues that the impeachment evidence would impact the credibility of Keyes' prior recorded statement, which was offered by the State as affirmative evidence that Wilson committed the alleged crimes. Wilson contends his inability to attack the credibility of part of the State's evidence undermines confidence in Wilson's conviction and makes the non-disclosure material to the defense.

---

[29] *Id.* at B30; App. to Opening Br. at A34.
[30] *Id.* at B107.
[31] *Id.* at B47–48; B62–70; B83.
[32] *Id.* at B26–27.
[33] 373 U.S. 83 (1963).

11

The State responds that the record supports the Superior Court's finding that the State disclosed the impeachment evidence to the defense immediately after the State became aware of it. The State also argues that Wilson's testimony on direct already discredited Keyes' prior recorded statement, and further impeachment would have been cumulative. And even if the State suppressed the impeachment evidence, it was not material and does not undermine confidence in the trial record full of other evidence supporting Wilson's conviction.

As we said recently in *Risper v. State*, under the United States Supreme Court's decision in *Brady*, "the prosecution has a constitutional obligation to disclose exculpatory and impeachment evidence within its possession to the defense when that evidence might be material to the outcome of the case."[34] There are three elements of a *Brady* violation: "(1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the state; and (3) its suppression prejudices the defendant."[35]

The Delaware United States Attorney's Office offer to Keyes was potentially impeaching. An offer of possible sentencing leniency in exchange for testifying during Wilson's trial could have undermined Keyes' trial testimony if he had testified that Wilson was implicated in the killing. It is also unclear when

---

[34] 250 A.3d 76, 90 (Del. 2021).
[35] *Risper*, 250 A.3d at 90 (quoting *Starling v. State*, 882 A.2d 747, 756 (Del. 2003)).

12

representatives of the State had knowledge of the offer.[36] But even if the State should have disclosed the offer earlier, it was immaterial to the trial and Wilson's convictions.

Impeachment evidence is material if the failure to disclose the evidence "undermines confidence in the outcome of the trial."[37] "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."[38] In *Kyles v. Whitley*, the U.S. Supreme Court held this is not a "sufficiency of the evidence test[;]" rather, a *Brady* violation is shown when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."[39]

Here, the possible impeachment evidence was not material to a fair trial. During his trial testimony Keyes "retracted his prior statements made to [Sergeant] Fox" and "unequivocally stated, in response to a question from [Wilson's counsel],

---

[36] After Wilson's trial, the United States Attorney's Office sent a letter to the State to inform it of the potential impeachment evidence for Keyes. App. to Opening Br. at A90–92. The letter said that Keyes and his lawyer met with Sergeant Fox, an Assistant United States Attorney, and two other federal agents on December 6, 2019. *Id.* at A91–93. Keyes discussed Wilson at this meeting, and "[p]ortions of Keyes' statement were recorded by [Sergeant Fox] . . . ." *Id.* at A91. The letter also said that "[p]rior to that recording, [the Assistant United States Attorney] told Keyes that if he testified in Wilson's state trial, his cooperation would factor into the government's ultimate sentencing recommendation in Keyes' federal case." *Id.* at A91–92. The letter does not clarify whether Sergeant Fox was present when this statement was made or aware of the offer presented to Keyes. *Id.* at A92.

[37] *U.S. v. Bagley*, 473 U.S. 667, 678 (1985).

[38] *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). *See also Risper*, 250 A.3d at 92–93.

[39] *Id.* at 434–35.

that [Wilson] never admitted to hiring anyone to kill the victim in this case."[40]  It would have been counterproductive to impeach Keyes' out of court statement when the defense wanted to rely on Keyes' credibility and his in-court testimony.  As explained by the Superior Court:

> During cross examination, Defense Counsel did inquire into Keyes' motivation for testifying, but he quickly realized that Keyes testimony was helpful to Defendant's case and pivoted from that line of questioning. At that point, it would have been unfruitful to impeach Keyes since his testimony served to benefit Defendant.  Instead, Defendant argued to the jury that Keyes' in-court testimony was to be believed, thereby thwarting the benefit to be derived by the State from its cooperating witness.[41]

Finally, as discussed earlier, we agree with the Superior Court that the evidence of Wilson's guilt in the trial record supports his convictions beyond a reasonable doubt.  But more important to our *Brady* analysis is our conclusion that the prosecution's disclosure to the defense of the offer to Keyes in the federal case would not have put Wilson's case in such a different light as to undermine confidence in the jury's verdict.  As the Superior Court held:

> the jury had available to it overwhelming, well corroborated, credible evidence in the forms of text messages, police testimony, and a 9-1-1 call that established that an attempted robbery of [sic] high-stakes dice game occurred on the East Side of Wilmington, just days before the murder at issue.  Multiple sources and witnesses were presented against Defendant for the purpose of demonstrating his involvement in the alleged crimes.[42]

---

[40] *Wilson*, 2021 WL 1056769, at *4.
[41] *Id.* at *5.
[42] *Id.* at *6.

## III.

We affirm the Superior Court's judgment.