IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALAN FOWLER, | § | |
| | § | No. 442, 2017 |
| Defendant Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Cr. ID Nos. 1108000561A; |
| STATE OF DELAWARE, | § | 1108000561B |
| | § | |
| Plaintiff Below, | § | |
| Appellee. | § | |

Submitted: August 15, 2018
Decided: August 27, 2018

Before **STRINE**, Chief Justice; **VAUGHN** and **TRAYNOR**, Justices.

Upon appeal from the Superior Court. **REVERSED** and **REMANDED**.

Herbert W. Mondros, Esquire, MARGOLIS EDELSTEIN, Wilmington, Delaware; Karl Schwartz, Esquire, THE LAW OFFICE OF KARL SCHWARTZ, Philadelphia, Pennsylvania, for Appellant, Alan Fowler.

Maria T. Knoll, Esquire, Deputy Attorney General, Department of Justice, Wilmington, Delaware, for Appellee, State of Delaware.

**STRINE**, Chief Justice:

In this case, defendant Alan Fowler was admittedly present at two melees during which shots were fired, and in one of those incidents, a mother of two was twice struck by bullets while shielding her sleeping children from the gunfire. Fowler was convicted of serious crimes, several of which were premised on him not just being present and part of a group of folks bent on vengeance for various social grievances against people they knew, but on his being the shooter.[1] After Fowler's trial and direct appeal were over, it emerged during post-conviction proceedings that the State had failed to provide *Jencks* statements to the defense of not one, but four, of its key witnesses.[2] In ruling on his post-conviction petition, the Superior Court held that the State had proved the error was harmless, largely based on the testimony of the State's ballistics expert, Carl Rone, who said that the same gun was used in both incidents.[3]

---

[1] *State v. Fowler*, 2017 WL 4381384, at *1 (Del. Super. Sept. 29, 2017) ("[A] jury found Fowler guilty of two counts of Attempted Murder First Degree, three counts of Reckless Endangering First Degree (one of which was a lesser included offense of one of the attempted murder counts), five counts of [Possession of a Firearm During the Commission of a Felony] and Criminal Mischief (I.D. No. 1108000561A). He was found guilty of two counts of [Possession of a Firearm by a Person Prohibited] by the Trial Judge after he had waived his right to a jury trial on those charges (I.D. No. 1108000561B). Subsequently, the Court granted motions for judgment of acquittal as to one of the Attempted First Degree Murder charges and its companion [Possession of a Firearm During the Commission of a Felony] charge.").

[2] App. to Opening Br. at A874 (Letter from Deputy Attorneys General to Counsel for Alan Fowler (Nov. 21, 2016)).

[3] *Fowler*, 2017 WL 4381384, at *6–7.

Then, when this case was on appeal and after the Superior Court had already ruled on the Rule 61 petition, evidence emerged that the expert, who was not even properly certified in the relevant area of firearms identification as of trial,[4] was being charged by the State with Theft by False Pretense over $1,500 and Falsifying Business Records to Make or Cause False Entry for "providing false [Delaware State Police] activity sheets and receiving compensation from [Delaware State Police] for work that was not performed."[5]

Faced with this new and disturbing development, the State pivoted. Having argued below that its four *Jencks* violations were harmless in substantial part because of the ballistics evidence it presented, on appeal it did a 180. Now, it tells us that we need not worry that its ballistics expert has serious credibility issues because he claimed pay for work he did not do. Why? Because its witness testimony, including that of the four witnesses for whom it failed to provide *Jencks* statements, was so strong.[6] In other words, it asked the Superior Court to excuse the *Jencks* violations as harmless because of the strength of its ballistic expert's testimony. And it now asks us to excuse the serious issues with that expert's credibility because of the

---

[4] App. to Opening Br. at A539–32 (Cross Examination of Carl Rone) (testifying that his certification in the area of firearm identification had expired).
[5] App. to Supp. Br. at SA2–5 (Carl Rone Arrest Warrant and Affidavit (May 3, 2018)).
[6] Answering Brief at 11 ("Rone's findings regarding the shell casings were corroborated by multiple witnesses at trial.").

2

compelling nature of testimony by witnesses, several of whose *Jencks* statements were not timely disclosed.

When the reliability of both strains of the key evidence the State used to prove Fowler was the shooter has been called into question, Rule 61 requires setting aside the conviction. In this context, it is the State's burden to convince us that the record demonstrates that their multiple violations of *Jencks* were harmless beyond a reasonable doubt. Given the importance to the case of whether Fowler was the shooter, the utility of the *Jencks* statements to the defense as to that key issue, and the inability of the State to any longer look to the ballistics testimony to support an argument for harmless error, the State has not met its burden. As important, the confidence-undermining development regarding the ballistics expert's credibility cannot be ignored on the now implausible basis that the eyewitness testimony—i.e., the testimony affected by the *Jencks* violations—is incontrovertibly dispositive. Rather than impose upon the Superior Court the burdensome step of conducting an evidentiary hearing under Rule 61 in these unusual circumstances, we vacate Fowler's conviction and remand for a new trial.

## I.

Defendant Alan Fowler was convicted of serious crimes for incidents on July 2, 2011 and July 31, 2011 during which the State alleged that Fowler fired an

3

identical .32 caliber firearm.[7] These two incidents might be seen to have some comic elements, if they had not resulted, in the first incident, in two men expecting to engage in a fistfight being instead ambushed by gunfire, and in the second, in a mother of two being shot twice and injured while shielding her sleeping children from gunfire. During the incidents, defendant Alan Fowler was admittedly present and part of a group of people involved in each instance.

In the first, Fowler and three friends, Brett Chatman, Tammi Boyd, and Danielle Maslin, were hanging out at Fowler's house in the Brookside neighborhood of Newark, Delaware.[8] Maslin was arguing with her ex-boyfriend, Michael Welcher, over the phone.[9] Fowler overheard the argument and began arguing with Welcher on Maslin's phone, and the two agreed to meet and fight.[10] Fowler, Chatman, Boyd, and Maslin drove to the house where Welcher's and others were on the front porch.[11] Shots were fired at the porch from Fowler's car.[12]

In the second melee, about a month later, Chatman and his friend, Jonathon Duarte, were at the Deer Park Tavern in Newark, Delaware, at the same time as Fowler's brother, Ken Fowler.[13] Another bar patron, Kyle Fletcher, and Ken Fowler

---

[7] Opening Br. at 5, 9.
[8] *Id.* at 5.
[9] *Id.*
[10] *Id.*
[11] *Id.* at 5–6.
[12] *Id.* at 6.
[13] *Id.*

4

got into a parking lot altercation. Fletcher allegedly stabbed Ken Fowler.[14] Chatman alerted Fowler, who was at the beach, of his brother Ken's injury.[15] Fowler and another man, unidentified by either the State or any trial witness, drove to Newark, picked up Chatman and Duarte, and drove around Newark searching for Fletcher.[16]

They drove to the house where they thought Fletcher lived, parked a few houses away, and all four men got out of the car and walked to the house.[17] According to the State's theory of the case, Chatman and Duarte stood some distance away from the house, Fowler allegedly kicked the front door of house, shot at the front door of the house, and shot through a window on the side of the house.[18] The other unidentified man also shot at the side of the house.[19]

But Fletcher no longer lived at the house. As it turned out, at the time of the shooting, it was occupied by Linda Lerdo, who was shot twice and injured while shielding her two young children from the gunfire.[20]

Hours after this second shooting, Fowler and Chatman drove to Chatman's aunt's house in West Palm Beach, Florida, where they were later joined by Duarte;

---

[14] *Id.*
[15] *Id.*
[16] *Id.* at 7.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] App. to Opening Br. at A886.

Fowler's on-again, off-again girlfriend, Emily Godek; and Emily's friend, Valentina Vitale.[21]

The police originally suspected Chatman was the shooter. While in Florida, Chatman learned from his mother that the police had executed a search warrant on his house and car, and he spoke with the Chief Investigating Officer, Detective Eckerd of the New Castle County Police Department, who urged him to return to Delaware for questioning.[22] Chatman was then arrested by local police officers in Florida.[23] Upon Chatman's arrest, Fowler, Duarte, Godek, and Vitale returned to Delaware in Godek's car,[24] because Fowler had abandoned his car in Daytona, Florida. Fowler was arrested in Pennsylvania on August 17, 2011.[25]

## II.

A grand jury indicted Fowler on three counts of Attempted Murder First Degree, two counts of Reckless Endangering First Degree, five counts of Possession of a Firearm During the Commission of a Felony, two counts of Possession of a Firearm by a Person Prohibited and one count of Criminal Mischief.[26]

---

[21] Opening Br. at 8.
[22] *Id.*
[23] *Id.* at 9.
[24] *Id.*; Answering Br. at 9.
[25] App. to Opening Br. at A202 (Direct Examination of Det. Michael Eckerd, Trial Tr. at 57:3–58:2 (May 13, 2011)).
[26] *Fowler*, 2017 WL 4381384, at *1.

At Fowler's trial, in which the charges for both incidents were jointly tried, a great deal of the State's evidence was dedicated to proving that Fowler was the shooter in both incidents and that he used the same gun in each incident. Not coincidentally, defense counsel's strategy at trial was to create reasonable doubt by attacking the credibility of the ballistics evidence and suggesting that Chatman—the only eyewitness to both shootings—either was the shooter or was not credible because he implicated Fowler for the shooting to avoid prosecution for being the shooter.

To undermine the credibility of the ballistics expert, Carl Rone, defense counsel pointed out that Rone's certification had lapsed at trial and that Rone had failed to have another examiner review and corroborate the results of his analysis.[27] Defense counsel also suggested that Chatman may have been the shooter. The police had caused Chatman to be arrested in Florida before they arrested Fowler, suggesting that Chatman was originally suspected of committing the shootings.[28] The defense tried to build on this by highlighting eyewitness testimony suggesting the shooter at each incident had attributes more like Chatman than Fowler. For example, eyewitnesses to the first shooting identified the shooter as having a full sleeve of

---

[27] App. to Opening Br. at A567 (cross-examination of Carl Rone Trial Tr. at 70:1–20 (May 9, 2013))

[28] Opening Br. at 9.

tattoos, consistent with a description of Chatman, not Fowler.[29]  And as to the second shooting, one eyewitness identified Chatman, not Fowler, as the shooter when shown video of the two.[30]  All told, defense counsel suggested that Chatman could have been the shooter because Fowler and Chatman share similar characteristics:

- Both were present at both shootings;

- Both are white;

- Both have tattoos; and

- Both wore striped polo shirts at the second shooting

To further undermine Chatman's credibility, defense counsel also suggested that Chatman told the police he was scared of Fowler to save himself from prosecution.[31]

Nonetheless, Fowler was found guilty.  The Superior Court granted Fowler's motion for a judgment of acquittal as to the count of Attempted Murder First Degree concerning the First Shooting in which Welcher was shot at, and its related count of

---

[29] App. to Opening Br. at A74 (Cross Examination of Michael Welcher, Trial Tr. at 98:3–9 (May 8, 2013) (testifying that the shooter had a full sleeve of tattoos); *id.* at A203–05 (Cross Examination of Det. Michael Eckerd, Trial Tr. at 65:15–66:1 (May 9, 2013)) (testifying that Chatman had a full sleeve of tattoos, but Fowler only had a half sleeve on his upper arm).

[30] *Id.* at A213 (Cross Examination of Det. Michael Eckerd, Trial Tr. at 75:4–23 (May 9, 2013) ("Q. Okay.  You had testified on your Direct Examination with respect to looking into the Kyle Fletcher slashing, stabbing, whatever you want to call it, and getting some help from the University of Delaware Police, who provided you their MVR, Motor Vehicle Recording cameras; right?  A. Yes.  Q. And that footage does depict Chatman, let's just call it responding to the scene; He shows up at the scene where Ken Fowler was stabbed, right?  A. Yes.  Q. And you showed that video to Mr. Abbott; is that correct?  A. That's correct, yes.  Q. And when you showed that video to Mr. Abbott, Mr. Abbott identified Chatman as the person he had seen kicking in the door at 49 Martindale; correct?  A. That is correct.)).

[31] *Id.* at A604 (Defense Closing Argument).

Possession of a Firearm During the Commission of a Felony,[32] and the Superior Court sentenced Fowler to 88 years of incarceration, suspended after 50 years, followed by decreasing levels of supervision.[33] Fowler's conviction was then affirmed on direct appeal.[34]

Then two important developments occurred during the period after Fowler challenged his conviction under Rule 61. Both developments are important and unusual and form the basis for Fowler's request for a new trial. The first involved the State's failure, which it contends was inadvertent, to provide the prior record statements of not one, but four, of its key witnesses,[35] as required by the rule articulated in *Jencks v. United States*,[36] adopted by this Court in *Hooks v. State*,[37] and codified in Superior Court Criminal Rule 26.2.[38] The *Jencks* statements that the

---

[32] *Id.* at A19–20 (Docket No. 143) (finding that "[t]he evidence does not allow a rational trier of fact to conclude beyond a reasonable doubt that Mr. Fowler engaged in conduct constituting Attempted Murder First Degree as charged," because "the evidence will not support a conclusion that it was anything other than an ill advised gesture prompted by an overabundance of male hormones."); *Fowler*, 2017 WL 4381384, at *1.

[33] *Fowler*, 2017 WL 4381384, at *1.

[34] *Fowler v. State*, 108 A.3d 1225, 2015 WL 304227 (Del. 2015) (TABLE).

[35] App. to Opening Br. at A874 (Letter from Deputy Attorneys General to Counsel for Alan Fowler) (Nov. 21, 2016)).

[36] 353 U.S. 657 (1957).

[37] 416 A.2d 189, 200 (Del. 1980).

[38] Super. Ct. Crim. R. 26.2(a) ("After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney general or the defendant and the defendant's attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession and that relates to the subject matter concerning which the witness has testified. For purposes of the application of this subdivision at a hearing on a motion to suppress evidence under Rule 12(b)(3), a law enforcement officer shall be deemed a witness called by the State.").

State failed to timely produce were those of Brett Chatman, Fowler's friend who was present at both incidents and accompanied Fowler to Florida; Jonathon Duarte, who was present at the second incident and later joined Fowler in Florida; Lance Walstrom, a neighbor who witnessed the second incident; and Emily Godek, Fowler's girlfriend who joined Fowler in Florida after the second incident.

These statements contain information that contradicts, to various degrees, the trial testimony of these witnesses, and also bears on the motives certain witnesses had to claim that Fowler, rather than others who were present at the incidents, was the shooter. Indeed, these *Jencks* violations call into question one of the State's two key pieces of evidence: Chatman's eyewitness testimony that Fowler was the shooter at both shootings.

Recognizing that the State had committed a *Jencks* violation, the Superior Court properly inquired into whether the State had proved that its multiple violations were harmless beyond a reasonable doubt by using the applicable test, which required weighing "1) the closeness of the case; 2) the centrality of the error to the case; and 3) steps taken to mitigate the effects of the violation."[39]

In finding against Fowler, the Superior Court acknowledged that "[i]n a case turning in large measure on the credibility of the witnesses . . . it is at an obvious disadvantage, because a different judge presided at the trial," but nevertheless found

---

[39] *Fowler*, 2017 WL 4381384, at *4 (citing *Hughes v. State*, 437 A.2d 559, 571 (Del. 1981)).

10

that the case was not close and that none of the arguable inconsistencies in the statements were, taken together, sufficient to render their non-production non-harmless.[40]  In so holding, the Superior Court judge found that Fowler knew about some of the inconsistencies because they involved admissions by the witness of conduct involving the witness and Fowler.[41]  The Superior Court judge, however, did not acknowledge that it is much more useful for cross examination to have an admission by a witness to the impeaching fact than simply a question of counsel casting doubt on the witnesses' assertion of fact.[42]  Even more importantly, the Superior Court's harmless error analysis heavily relied on "*the fact that ballistic*

---

[40] *Id.* at \*6 ("Given all of that, it is clear to the Court that the information in the undisclosed statements was either known to Fowler, cumulative of information known to Fowler, or revealed in trial testimony.").

[41] *E.g.*, *id.* at \*5 ("Fowler knew that Chatman and the other witnesses had been drinking and in some cases taking Xanex on the night of the July 2nd shooting."); *id.* ("Fowler also knew, as Chatman testified, that he had maintained some degree of contact with Fowler after the July 2nd shooting, including travelling to Florida with him."); *id.* at \*6 ("Fowler knew that Duarte did not give a complete statement to the police concerning the stabbing incident . . . ."); *id.* ("Fowler was aware that Duarte had deleted some information from his telephone . . . ."); *id.* ("[T]he latter two [statements] were clearly matters within Fowler's knowledge.").

[42] *See Rosenberg v. United States*, 360 U.S. 367, 376 (1959) (Brennan, J., dissenting) ("In short, only a very strict standard is appropriate for applying the harmless error doctrine in these cases. Under such a standard, I cannot conclude that defense counsel could not have put [the victim's] letter to effective use in impeaching her.  Although she stated on cross examination that she had refreshed her memory before testifying by reference to a statement she had made previously, this oral testimony was obviously not as useful for impeachment purposes as her written admission shortly before trial that her memory of the events in question was failing.  Defense counsel, if armed with the letter, might well have probed more deeply than he did in testing how her memory of the events to which she testified was refreshed.  The trial strategy of defense counsel, familiar with his case and aware of the various possible lines of defense, might have been entirely different had he been in possession of the letter.  At least I cannot bring myself to assume that this would not have been the case.").

11

*evidence linked the same weapon to both incidents [that] makes the evidence of Fowler's guilt in each separate incident mutually reinforcing.*"[43]

After this ruling, and when this case was on appeal, the second and even more unusual development occurred. The State arrested Carl Rone, the ballistics expert who testified at Fowler's trial that the same .32 caliber firearm was used in each incident, for Theft by False Pretense and Falsifying Business Records to Make or Cause False Entry.[44] Rone's testimony was vital to both the State's trial case and the Superior Court's opinion because if one accepted the expert's testimony, that the same weapon was present at each incident, it gave the jury and the Superior Court a basis other than eyewitness testimony to conclude that Fowler was the shooter. This new development casts doubt on Rone's credibility. This doubt came on top of the realities that (i) as of the trial, Rone had already let his certification lapse,[45] and (ii) the methodology Rone used, one that has been the subject of increasing scrutiny, is dependent in large measure on the reliability of observations by the expert himself.[46] Because of these new developments, Fowler sought leave to argue that

---

[43] *Fowler*, 2017 WL 4381384, at *6 (emphasis added); *see also id.* at *4 ("Ballistics evidence identified the weapon used in both incidents as the same.").

[44] App. to Supp. Br. at SA1–5 (Carl Rone Arrest Warrant and Affidavit).

[45] App. to Opening Br. at A539–32 (Cross Examination of Carl Rone) (testifying that his certification in the area of firearm identification had expired).

[46] *See* Committee on Identifying the Needs of Forensic Sciences Community, *Strengthening Forensic Science in the United States: A Path Forward* 153 (National Academy of Science 2009), available at https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf ("Knowing the extent of agreement in marks made by different tools, and the extent of variation in marks made by the same

12

he should receive a new trial during which Rone's credibility and reliability could be tested in light of this new information. That leave was granted and the key issues before us therefore are whether Fowler is entitled to a new trial because of (i) the confidence-undermining nature of the State's decision to indict its own expert; and (ii) the prejudice caused by the four *Jencks* violations. As we next explore, these issues must be considered in relation to each other.

## III.

It is the State's burden to show that both the Rone issue and the State's *Jencks* violations were harmless beyond a reasonable doubt.[47] This is an exacting standard that cannot be satisfied if the Court is left with a reasonable fear that an injustice has occurred that might have influenced the outcome at trial.[48] In view of the new

---

tool, is a challenging task. AFTE [Association of Firearm and Tool Mark Examiners] standards acknowledge that these decisions involve subjective qualitative judgments by examiners and that the accuracy of examiners' assessments is highly dependent on their skill and training.").

[47] *Hansley v. State*, 104 A.3d 833, 837 (Del. 2014), *as corrected* (Nov. 5, 2014) ("Under a harmless error analysis, '[t]he defendant has the initial burden of demonstrating error,' and then the State has the burden to demonstrate that any error was harmless beyond a reasonable doubt." (quoting *Williams v. State*, 98 A.3d 917, 921–22 (Del. 2014) (modifications in original)).

[48] Indeed, in *Chapman v. California*, 386 U.S. 18 (1967), where the Supreme Court first adopted harmless error review, "the Court announced a very exacting test that must be satisfied before a constitutional error can be regarded as harmless." CHARLES ALAN WRIGHT, ET AL., 3B FED. PRAC. & PROC. CRIM. § 855 (4th ed.). The harmless error standard thus requires that we be convinced "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24. That is, "[w]hen a [ ] judge . . . is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless. And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks omitted). The focus is on the effect of the error; guilt or innocence should be neutralized in a court's decision about whether a constitutional error was harmless. *See Chapman*, 386 U.S. at 23.

13

development compromising the ballistics evidence, and its relationship to the eyewitness testimony affected by the *Jencks* violations, the State has failed to convince us that we can disregard these material issues as harmless. We now explain why that is so.

The State's only argument on appeal for not granting Fowler a new trial in which he can impeach Rone's credibility is based solely on the premise that the expert's testimony was not vital to the case against Fowler, despite its obvious relevance to the key issue of whether Fowler was the shooter at one or both shootings.[49] The State does not offer other possible reasons relating to its ignorance of the expert's conduct at the time of trial and the bearing that might have on whether relief is due to Fowler. Rather, it claims that the expert's testimony was not important because there were multiple eyewitnesses who testified that Fowler was the shooter at each shooting.[50]

Herein lies the rub. Among the witnesses the State relies upon to argue that the Rone issue is harmless are the four whose prior statements were improperly denied to Fowler at the time of his trial. In effect, now both of the State's key pieces of evidence—Chatman's testimony and ballistics evidence—have had their

---

[49] Answering Br. at 13 ("In any event, Rone's testimony was not crucial to Fowler's conviction.").
[50] *Id.* at 11 ("Rone's findings regarding the shell casings were corroborated by multiple witnesses at trial.").

14

reliability cast into doubt. On top of using the witness testimony to excuse Rone's indictment, the State continues to suggest that the *Jencks* violations were harmless because the ballistics evidence was so strong.[51] Thus, the State's argument is circular, and the State is trying to have each strand of arguably compromised evidence excuse the other. That type of argument undermines and does not promote confidence. Both the eyewitness testimony and the ballistics evidence were critical to the State's attempt to prove that Fowler was the shooter at both shootings. The *Jencks* violations go to the reliability of the first category.

Defense counsel could have used the *Jencks* statements to advance his strategy of impugning Chatman and Duarte's credibility. A key part of defense counsel's trial strategy was to question Chatman and Duarte's credibility by arguing that Chatman and Duarte were trying to redirect prosecutorial attention away from themselves and onto Fowler, a strategy that worked. Chatman had a strong motive to do that because the police first arrested him, not Fowler, and seem to have suspected him of committing the shootings. The defense theory also had grounding in other record evidence because Chatman's attributes were identified by some witnesses as closer to that of the shooter than Fowler's. Duarte appears to have been a close friend of Chatman; thus his loyalties and the possibility that police would

---

[51] *Id*. at 30–31 ("The Superior Court also properly determined that the case against Fowler was strong . . . . Thus, the closeness of the case factor in the harmless error analysis weighs in favor of the State.").

15

conclude that he was acting in concert with Chatman could be seen as giving him a similar motive. Given these realities, information undercutting Chatman and Duarte's credibility was material to the defense. And an effective advocate could have used the undisclosed *Jencks* statements to further his theory of the case.

By way of example, at trial, unlike in their *Jencks* statements, Chatman and Duarte's accounts of the second shooting do not suggest that Fowler forced them into the car. At trial, Chatman offered a straightforward account of voluntarily getting into Fowler's car before the shooting.[52] But in his undisclosed *Jencks* statement, Chatman states that Fowler coerced him into the car through threats of violence.[53] The same is true of Duarte. His testimony suggests he got into Fowler's car before the second shooting voluntarily,[54] but Duarte accuses Fowler of using physical violence to coerce him into the car in his undisclosed *Jencks* statement.[55] Defense counsel could have used these discrepancies to suggest that Chatman and

---

[52] App. to Opening Br. at A281 (Direct Examination of Brett Chatman, Trial Tr. at 143:6–144:7 (May 9, 2013)) ("Q. The defendant, did you just get into his car, or how does he pick you up? How do you end up in his car? A. Um, he pulls up, and he got out and told us to get to the car. . . . Q. Did you want to get in the car? A. No. Q. Why not? A. I just had a bad feeling.").

[53] *Id.* at A654 (Undisclosed Statement of Brett Chatman at 33 (April 26, 2012)).

[54] *Id.* at A410–11 (Direct Examination of Jonathon Duarte, Trial Tr. at 26:18–27:3 (May 9, 2013)) (Q. . . . What happens next? A. He, um told to us [sic] get in the car. Q. Do you get in the car with him? A. Yes.").

[55] *Id.* at A725 (Undisclosed Statement of Jonathon Duarte at 49 (April 5, 2012)) ("And then [Fowler]—yeah, he grabs Brett first. He grabbed Brett, but he didn't like grab Bret [sic] like he did to me. Like he grabbed Brett and I mean, like kind of pushed him against the car and was on him. And then he looked at me. And then he goes up to me and grabs me around my neck, do you know what I mean?").

16

Duarte had lied to police earlier about being coerced and did so to convince police that Fowler was the shooter and avoid prosecution themselves.

Furthermore, the *Jencks* statements reveal discrepancies about whether Chatman continued to help Fowler find Fletcher after the second shooting, which could have helped defense counsel's efforts to suggest that Chatman was as likely to be the shooter as Fowler. In his undisclosed *Jencks* statement, Duarte said that, after the second shooting, Chatman not only provided Fowler with the location of another house where one of the perpetrators of Ken Fowler's stabbing might be, but also accompanied Fowler to that location.[56] Neither Chatman nor Duarte mentioned this frolic and detour at trial.[57] Effective trial counsel could have used this inconsistency to suggest that Chatman—far from being an unwilling bystander— was more involved in the second shooting than he previously testified. Defense counsel could also use the discrepancy to suggest that Chatman had a motive for being the shooter—to address his embarrassment and loss of face at having been

---

[56] *Id.* at A749 (Undisclosed Statement of Jonathon Duarte at 49 (April 5, 2012)) (DB: Okay. What did he [Chatman] say about him [person Chatman told Fowler may know where Fletcher is after the shooting]? JD: He just said, "Oh I think he knows him . . . I'm not—like I don't know if he'll probably know where he is." . . . JD: And, um, we go by there [where the person discussed above lives] and he, he like parks up kind of like at the front of the development and they like walk away from me. Like him [Fowler] and Brett because Brett said he knew the kid. He knew where he— exactly where he lived. So they go over there. I guess they had, you now, they had a discussion with the kid's mom or something cause the kid wasn't home.").

[57] *See id.* at A308–09 (Direct Examination of Brett Chatman, Trial Tr. at 170:1–171:23 (May 9, 2013)); *id.* at 418–21 (Direct Examination of Jonathon Duarte, Trial Tr. at 34:20–37:23 (May 9, 2013)).

17

present when his friend's brother, Ken Fowler, was stabbed by getting revenge on the perpetrators. Such an argument would have aligned with defense counsel's argument and trial evidence suggesting that Chatman was the shooter at the second shooting.

Admittedly, the State had other eyewitnesses who testified that Fowler was the shooter. For instance, Maslin and Boyd—the other two people in Fowler's car at the first shooting—both testified that Fowler was the shooter at the first incident.[58] But Chatman was the only eyewitness to testify that Fowler was the shooter at both shootings. It is also of course true that none of the inconsistencies in the *Jencks* statements provide an irrefutable, or even compelling, basis to conclude that Chatman and Duarte were not telling the truth. But that is not the test. The question is whether they contain information that a skilled cross-examiner could have used to create reasonable doubt about whether Fowler was the shooter by buttressing defense counsel's theory that Chatman (and his friend Duarte) escaped prosecution themselves by falsely identifying Fowler as the shooter.

And in concluding that the State has failed to demonstrate harmless error, we take into account another reality. None of the State's witnesses, including their key eyewitnesses Chatman and Duarte, were, let's say, George Washington. It seems

---

[58] App. to Opening Br. at A112 (Direct Examination of Danielle Maslin, Trial Tr. at 158:4–6 (May 13, 2011)); *id.* at 152 (Direct Examination of Tammi Boyd, Trial Tr. at 198:11–14 (May 13, 2011)).

likely that many of them could tell lies, and do things that many would consider even worse. When a witness is caught on the stand on cross in lies, that can lead the witness off in directions adverse to the theory his direct examination was designed to advance. And when a witness gets caught in several lies, that can have the effect of making reasonable jurors discount his testimony. That is especially the case when the witness, as in the case of both Chatman and Duarte, had their own motives to give testimony shifting blame away from themselves.

When it performed its harmless error analysis, the Superior Court rightly looked to the entire record. In doing so, it logically focused on the ballistics testimony by Rone. Why? Because although there was conflicting witness testimony at trial, some of which suggested that the shooter had characteristics more like Chatman than Fowler, "the fact that ballistic evidence linked the same weapon to both incidents makes the evidence of Fowler's guilt in each separate incident mutually reinforcing."[59] Likely, of course, the same testimony helped the jury reconcile any inconsistency in the witness testimony about who was the shooter in favor of the State's theory. But we must now discount that testimony because of the new developments raising serious concerns about Rone's credibility.

---

[59] *Fowler*, 2017 WL 4381384, at *6.

19

Rone presented evidence critical to the State's theory of the case. The State's indictment of Rone for Theft by False Pretense and Falsifying Business Records to Make or Cause False Entry[60] goes to both Rone's professional reliability and honesty. It also raises questions about whether Rone did the work he says he did or whether he would just testify to the result he knew the State wanted. Defense counsel thoroughly cross-examined Rone at trial, but this new evidence would materially aid counsel's strategy to undermine Rone's credibility. And Rone's credibility was essential to his testimony because the methodology he used is dependent in large measure on the reliability, and therefore credibility, of the expert's observations.[61] As to this point, Rone had already let his certification lapse.[62] With the integrity of Rone's testimony at issue, Fowler's argument that Rone reached his conclusions based on the State's theory of the case, rather than an independent review of the evidence, carries more weight.

Candor requires us to acknowledge that the State is correct that the evidence that Fowler's behavior in the two incidents was criminal is very strong. Fowler indisputably was present and a motivating force in stupid, violent behavior that resulted in serious harm to others. But, as the State's own view of the case makes

---

[60] App. to Supp. Br. at SA2–5 (Carl Rone Arrest Warrant and Affidavit (May 3, 2018)).
[61] *See United States v. Ashburn*, 88 F. Supp. 3d 239, 248 (E.D.N.Y. 2015) (collecting examples of district courts noting that "toolmark and firearms identification is at bottom a subjective inquiry").
[62] App. to Opening Br. at A539–32 (Cross Examination of Carl Rone)

20

plain, what precisely Fowler was guilty of turned importantly on whether he was the shooter. Both of the strands of evidence that the State relied upon to prove that fact have now been materially compromised in different ways, and the State therefore cannot shore up the weaknesses of one strand with the other.

Given the important change in the factual record on appeal, we cannot sustain the Superior Court's determination that the *Jencks* violations were harmless beyond a reasonable doubt. We do not at all fault the Superior Court judge who carefully considered the record before him. We just face the reality that the foundation of his findings has been undermined by events no one foresaw.

Having determined that we cannot conclude that the *Jencks* violations and Rone's indictment were harmless beyond a reasonable doubt, we must now decide the appropriate remedy. In his briefs, Fowler takes various positions on the appropriate remedy, and at times argues that we should remand this to the Superior Court for another Rule 61 hearing.[63] At other points, he argues that he should be given a new trial.[64] Because, as he acknowledged, the Superior Court judge now

---

[63] *See* Supp. Br. at 2 ("In the interests of justice, and pursuant to his rights to confrontation, due process and a fair trial, Mr. Fowler must be given an opportunity to prove otherwise, at an evidentiary hearing in the Superior Court.").

[64] *See* Opening Br. at 47 ("For all of the foregoing reasons, the Defendant Alan Fowler respectfully requests that the Court reverse the judgment of the Superior Court, vacate his convictions and sentence, and remand this matter for a new trial.").

21

assigned to this matter was not the original trial judge,[65] any remand would require him to assess the harmless error question as to the *Jencks* statements anew, to take into account the new development involving Rone's indictment, and as important, to hold an evidentiary hearing as to the Rone issue itself. Precisely because he was not the trial judge, the current Superior Court judge is in no better position to assess harmless error than we are, and a remand proceeding would impose a serious burden on him; one that could require him to hold both an evidentiary hearing, issue a formal opinion, and then have to hold a new trial. And no Rule 61 hearing will ever fully dispel the uncomfortable reality that Fowler had a trial where his defense counsel was denied timely access to four *Jencks* statements and where the ballistics evidence against him was presented by someone the state has now indicted for falsifying his work records. Based on the unusual confluence of events presented here and the standard of review we are required to apply, justice demands that we reverse the

---

[65] *Fowler*, 2017 WL 4381384, at *6 ("The Court recognizes that it is at an obvious disadvantage, because a different judge presided at the trial. In a case turning in large measure on the credibility of the witnesses, the Court has no ability to assess a significant factor in determining credibility—the witness' demeanor on the witness stand.").

Superior Court's denial of Fowler's motion for post-conviction relief, vacate his convictions,[66] and remand for a new trial.[67]

---

[66] For the first time on appeal, Fowler argues (1) that the undisclosed statements constitute a *Brady* violation; (2) the State's alleged failure to correct a witnesses' false testimony constitutes a *Napue/Giglio* violations; and (3) his trial counsel was ineffective because he failed to challenge the admissibility of Rone's expert testimony. Opening Br. at 32–38. Because the State's *Jencks* violation is sufficient to warrant a new trial, we decline to consider these arguments. *See United States v. Zomber*, 299 Fed.Appx. 130, 135 n.8 (3d Cir. 2008) (declining to rule on a *Brady* claim because the result of the harmless error analysis of the *Jencks* claim was dispositive).

[67] Because the original Superior Court judge acquitted Fowler on the count of Attempted Murder First Degree concerning the First Shooting and its related count of Possession of a Firearm During the Commission of a Felony, *see* App. to Opening Br. at A19–20 (Docket No. 143); *Fowler*, 2017 WL 4381384, at *1, any new trial can concern only the charges Fowler was convicted for and not the charges which the original Superior Court judge acquitted.

23