# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,      )
                                          )
                                          )  ID No. 0909018475 A/B
                                          )

v.                          )
                                          )

MICHAEL T. WASHINGTON,   )
                                          )

Defendant.        )
                                          )

Submitted: August 26, 2021
Decided: November 9, 2021

## MEMORANDUM OPINION

*Upon Defendant's Second Motion for Postconviction Relief*
**DENIED.**

Carolyn S. Hake, Esquire, Deputy Attorney General, State of Delaware Department of Justice, 820 North French Street, Wilmington, DE 19801.

Patrick J. Collins, Esquire, Collins & Associates, 8 East 13th Street Wilmington, DE 19801, Attorney for Defendant.

**WHARTON, J.**

## I.     INTRODUCTION

Michael T. Washington ("Washington") filed his second Motion for Postconviction Relief on August 30, 2019, seeking a new trial based on newly discovered evidence of actual innocence. After considering Washington's claims, the Court finds his claims are barred by Delaware Superior Court Rule 61 ("Rule 61"). In particular, it is barred as untimely under Rule 61(i)(1), as a successive motion under Rule 61(i)(2), and, in part, by procedural default under Rule 61(i)(3). The evidence he presents fails to satisfy the new evidence of actual innocence standard of Rule 61 in order to make the bars to relief inapplicable. For the reasons stated below, Washington's Motion is **DENIED.**

## II.     FACTUAL AND PROCEDURAL CONTEXT

In November, 2010, Washington was convicted by a Superior Court jury of two counts of each of Manslaughter and Possession of a Firearm During the Commission of a Felony ("PFDCF") in the shooting deaths of Leighton Francis and Amin Guy, and, in a subsequent bench trial, an additional severed count of Possession of a Firearm by a Person Prohibited ("PFBPP").[1] Washington was sentenced on February 11, 2011, to eighty-six years of imprisonment at Level V, suspended after sixty-four years for decreasing levels of supervision.[2]

---

[1] *Washington v. State,* 2011 WL 4908250, at *1 (Del. 2011).
[2] *Id.*

The facts of this case as summarized by the Delaware Supreme Court in

Washington's direct appeal, are as follows:

> It appears from the record that Francis and Guy were found shot to death on September 1, 2008 (hereinafter "the shooting") in the front seat of a bullet-ridden black Lexus (hereinafter "the vehicle") in the 500 block of E. 10th Street. The first police officer to arrive at the scene found the vehicle stopped in the middle of traffic, still in gear and wedged against another car.
>
> Detective John Ciritella of the Wilmington Police Department (hereinafter "Ciritella") was assigned to investigate the shooting. As the investigation unfolded, Ciritella theorized that the shooting occurred from inside the vehicle as it was leaving the 700 block of E. 10th Street and that the vehicle continued moving until it came to a stop in the 500 block.
>
> Ciritella recovered a significant number of bullets, bullet fragments and/or shell casings, from the interior of the vehicle, the 700 block of E. 10th Street, and the victims' bodies following the medical examiner's autopsies. Ciritella did not, however, recover a weapon that was used in the shooting.
>
> At trial, Ciritella testified that initially and for several months after the shooting, he could not develop a lead on a suspect. Finally, however, in April 2009, Ciritella was advised that an inmate in federal custody, Christopher Waterman, was interested in disclosing information about the shooting that he had allegedly heard from another inmate. The other inmate turned out to be Washington. Similarly, in May 2009 and December 2009, Ciritella learned that inmates William Coleman and Isaiah Fields also wanted to disclose information that another inmate, again Washington, purportedly told each of them about the shooting. Ciritella conducted individual one-on-one interviews with Waterman, Coleman, and Fields. As a result of those interviews, Ciritella learned that between the fall of 2008 and the spring of 2009, Washington allegedly individually told Waterman, Coleman, and Fields at different times that he was either in the vehicle during the shooting or that he was the shooter, and that the weapon involved in the shooting was a "Mac 10," which Ciritella knew was a candidate

3

weapon. Ciritella also learned from Waterman, Coleman, and Fields that the shooting was possibly the result of a botched robbery or a dispute over a drug deal, and that the gun had discharged unexpectedly in the vehicle.

Ciritella learned additional information from Coleman about Washington's possible involvement in the shooting, namely that Washington was worried that a resident of the 700 block of E. 10th Street, April Gardner ("Gardner"), had witnessed the shooting. Moreover, Fields told Ciritella that he was with Washington in June or July 2008 at 930 Spruce Street, a drug hangout, when the "Mac 10" Washington was holding suddenly went off and sprayed gunfire.

As a result of his interview with Fields, Ciritella obtained a search warrant for 930 Spruce Street and in the ensuing search found a number of bullet holes in the floor and walls from which he recovered three bullets. From his interview with Coleman, Ciritella was able to locate Gardner at her 729 E. 10th Street home. Gardner told Ciritella that she witnessed the events leading to the shooting on September 1, 2008 from the front steps of her home.

At trial, Gardner testified that, prior to the shooting, she was outside sitting on her front steps watching her grandson ride his bicycle when she observed Washington and another male—later identified as Guy—walking down 10th Street. Gardner told the jury that she knew Washington because he had grown up in the neighborhood and had gone to school with her children.

Gardner testified that she observed Washington and his companion approach another man who was sitting in the driver's seat of a vehicle that was parked directly in front of her house. According to Gardner, after the three men conversed briefly, Guy got into the right front passenger seat of the vehicle and Washington got into the right rear passenger seat.

Gardner testified that moments after the two men entered the vehicle the vehicle's windows "erupted." Shocked by the explosion, Gardner said, she immediately "grabbed [her] grandson" and ran to her daughter's house around the corner on Bennett Street where she remained for several hours before returning home. Gardner testified

4

that as she ran from the scene, she could feel shards of glass getting caught in her hair, and that she had "glass all in [her] hair" when she reached her daughter's house. Gardner further testified that Washington came to her home later that evening "to apologize," but that she refused to speak to him.

At trial, the State's ballistics expert, Delaware State Police Firearms Examiner Carl Rone (hereinafter "Rone"), opined that the strafing of the vehicle's interior was the result of a semi-automatic or automatic weapon discharging more than thirty rounds inside the vehicle from the area of the right rear passenger seat. Rone further opined that the sixteen bullets and thirty spent shell casings he examined, which were recovered from the vehicle, the victims' bodies, and 930 Spruce Street, all came from the same semi-automatic or automatic weapon.

Washington testified at trial that he visited "Miss April" later in the evening on September 1, 2008, because he was sorry to hear that Leighton [sic] and Francis had been shot in front of her house, and that she had witnessed the shooting. Washington also testified that, a few days prior to the shooting, he had a conversation with Leighton and Guy, while in the vehicle, about a gun his cousin wanted to sell. According to Washington, the gun he was helping his cousin sell "hold[s] 30 rounds" and was "the same gun that went off in the house [on] 930 Spruce Street." Washington denied any involvement in the shooting, however, and he testified that at the time of the shooting he was "cooking up some drugs" at 930 Spruce Street.[3]

Washington appealed his convictions to the Delaware Supreme Court. He raised two issues on appeal: (1) the prosecutor committed misconduct when she referred to a cell phone call during her opening statement, and (2) the State's ballistic expert testified at trial, contrary to his report, that bullet fragments recovered in the

---

[3] *Id.,* at *1-3.

5

700 block of E. 10th Street "matched" those recovered from the victim's bodies.[4]

The Delaware Supreme Court affirmed Washington's convictions.[5]

On March 7, 2012, Washington filed a timely *pro se* motion for postconviction relief pursuant to Rule 61.[6] Later, Washington filed an Amended Motion for Postconviction Relief on August 7, 2012.[7] Then, on February 25, 2013, Washington filed a Motion for Appointment of Counsel.[8] After supplementation of the record by trial counsel, appointment of postconviction counsel, the State's response, and postconviction counsel's motion to withdraw, Washington filed amendments to his *pro se* motion for postconviction relief in March 2016.[9] Ultimately, Washington's postconviction relief motion was denied by the Superior Court.[10] The Supreme Court affirmed that decision.[11]

On May 24, 2017, Washington filed a timely petition for federal habeas relief.[12] In April of 2019, Washington moved to stay the federal proceedings to "argue the newly discovered evidence in the Superior Court in order to properly

---

[4] *Id.*, at *3-4.
[5] *Id.*
[6] D.I. 64.
[7] D.I. 77.
[8] D.I. 95.
[9] D.I. 139.
[10] *State v. Washington,* 2016 WL 6248462 (Del. Super. 2016).
[11] *Washington v. State,* 2017 WL 1573119 (Del. 2017).
[12] State's Resp. to Def.'s Second Mot. for Postconviction Relief, at 4, D. I. 182.

exhaust his remedies and avoid any procedural issue[s]… in this district court."[13] The District Court granted his motion and stayed the matter.[14] On August 30, 2019, Washington filed his second *pro se* Motion for Postconviction Relief and a Motion for Appointment of Counsel.[15] On September 9, 2019, the Court directed the appointment of counsel.[16] Then, through counsel, Washington filed an amended second motion on April 28, 2020.[17] The State filed its Response on March 1, 2021.[18] Next, postconviction counsel sought, and was granted a stay for a reply until the Delaware Supreme Court issued its opinion in *Purnell v. State*.[19] That opinion was issued on June 17, 2021. Washington filed reply to the State's response on July 27, 2021.[20] The State responded to Washington's reply on Aug. 26, 2021.[21]

### III.   THE PARTIES CONTENTIONS

Washington contends he is entitled to postconviction relief because newly discovered evidence creates a strong inference that he is "actually innocent." Washington argues three pieces of new evidence exist that undermine confidence in the result of his trial. First, inmate witness Christopher Waterman ("Waterman")

---

[13] Def.'s Second Mot. for Postconviction Relief, at 9, D.I. 173.
[14] *Id.*
[15] Def.'s Mot. for Postconviction Relief, D.I. 163, 164.
[16] D.I. 165.
[17] Def.'s Second Mot. for Postconviction Relief, D.I. 173.
[18] State's Resp. to Def.'s Second Mot. for Postconviction Relief, D.I.
[19] 254 A.3d 1053 (Del. 2021).
[20] Def.'s Second Mot. For Postconviction Relief Reply to State's Resp., D.I. 197.
[21] State's Resp. to Def.'s Reply Brief, D.I. 199.

recanted his testimony.[22]  Second, inmate witness Isaiah Fields ("Fields") was the beneficiary of a tacit sentence reduction agreement that was not disclosed to the defense, resulting in a *Brady* violation.[23]  Finally, the State's expert ballistics witness, Forensic Firearms Examiner Carl Rone ("Rone") misled the jury by misrepresenting his credentials and his identification methods have been shown to be "subjective and unreliable."[24]  The State contends Washington is procedurally barred from asserting a claim under Rule 61 because: (1) it is untimely; (2) it is a successive motion; and (3) his claims related to Fields and Rhone were not raised on direct appeal or in his first postconviction relief motion.[25]  Additionally, the State argues that Washington has failed to overcome the bars to relief erected by Rule 61 because his claims are neither newly discovered, nor do they establish actual innocence.[26]

## IV.  STANDARD OF REVIEW

Delaware Superior Court Rule 61 provides an individual with the ability to seek postconviction relief.[27]  The Delaware Supreme Court has held that Delaware

---

[22] Def.'s Second Mot. for Postconviction Relief, at 12, D.I, 173.
[23] *Id.*
[24] *Id.*
[25] State's Resp. to Def.'s Second Mot. for Postconviction Relief, at 11-15, D.I. 182.
[26] *Id.*, at 9.
[27] Super. Ct. Crim. R. 61.

courts should apply the version of Rule 61 at the time a defendant filed his motion for postconviction relief.[28] Washington filed his second Rule 61 motion in August of 2019. Therefore, Washington's motion is governed by the version of Rule 61 existing after the substantial amendments to it became effective on June 14, 2014.

The Court considers a motion under Rule 61 as a matter of discretion.[29] Before looking to the exceptions to Rule 61, this Court must first consider and apply the procedural bars set forth in Rule 61.[30] A motion for postconviction relief can be barred for time limitations, successive motions, procedural default, or former adjudication.[31] A motion exceeds time limitations if it is filed more than one year after the conviction becomes final, or, if it asserts a retroactively applicable right that is newly recognized after the judgment of conviction is final, more than one year after the right was first recognized by the Supreme Court of Delaware or the United States Supreme Court.[32] A second or subsequent motion is considered successive and therefore barred and subject to summary dismissal unless the movant was convicted after a trial and "pleads with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts

---

[28] *Jones v. State*, 127 A.3d 397, 1 (Del. 2015).
[29] *Durham v. State*, 2017 WL 5450746, at *1 (Del. Nov. 13, 2017) (citing *Claudio v. State*, 958 A.2d 846, 847 (Del. 2008)).
[30] *Id.*
[31] Super. Ct. Crim. R. 61(i).
[32] Super. Ct. Crim. R. 61(i)(1).

underlying the charges of which he was convicted" or "pleads with particularity a claim that a new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court or the Delaware Supreme Court, applies to the movant's case and renders the conviction ... invalid."[33] Grounds for relief "not asserted in the proceedings leading to the judgment of conviction" are barred as procedurally defaulted unless the movant can show "cause for relief" and "prejudice from [the] violation."[34] Grounds for relief formerly adjudicated in the case, including "proceedings leading to the judgment of conviction, in an appeal, in a post-conviction proceeding, or in a federal habeas corpus hearing" are barred.[35] The bars to relief do not apply either to a claim that the court lacked jurisdiction or to a claim that pleads with particularity that new evidence exists that creates a strong inference of actual innocence,[36]

To prove a claim that newly discovered evidence exists that creates a strong inference of actual innocence, a petitioner must show "the evidence (a) will probably change the result if a new trial is granted; (b) was discovered since the trial and could not have been discovered before by the exercise of due diligence; and (c) is not

---

[33] Super. Ct. Crim R. 61(i)(2); Super. Ct. Crim. R. 61(d)(2).
[34] Super. Ct. Crim. R. 61(i)(3).
[35] Super. Ct. Crim. R. 61(i)(4).
[36] Super. Ct. Crim. R. 61(i)(5).

merely cumulative or impeaching."[37]  Satisfying the actual innocence test is a heavy burden and such claims are rare.[38]  Furthermore, to prove "[i]nnocence of the 'acts underlying the charges' requires 'more than innocence of intent; it requires new evidence that a person other than the petitioner committed the crime.'"[39]  The Delaware Supreme Court also held in *Purnell* that "a body of new evidence that goes only to the weight or credibility of that which was presented to the jury is almost never adequate to meet the demanding bar for being granted a new trial."[40] Attacking a witness's credibility in general will not be sufficient to satisfy the actual innocence standard.[41]

## V.    DISCUSSION

Washington's Motion is procedurally barred under Rule 61 because it is untimely, successive, and raises grounds not asserted previously.  He has failed to overcome these bars because the evidence he has produced is either not newly discovered, fails to establish actual innocence, or both.

---

[37] *Taylor v. State*, 180 A.3d 41 (Del. 2018) (citing *Downes v. State*, 771 A.2d 289, 291 (Del. 2001).
[38] *Purnell v. State*, 254 A.3d 1053, 1100 (Del. 2021).
[39] *Id.* at 1095 (citing *State v. Taylor*, 2018 WL 3199537, at *7 (Del. Super. Ct. June 28, 2018), *aff'd*, 206 A.3d 825 (Del. 2019)).
[40] *Id.* at 1098.
[41] *Id.*

Establishing actual innocence requires evidence that will probably change the result if a new trial is granted.[42]  All three of Washington's claims of newly discovered evidence fail to address, and therefore to overcome, highly incriminating testimony of the eyewitness, April Gardner.  Gardner testified that while watching her grandson ride his bicycle in front of her house, she observed Washington enter the right rear passenger seat of the vehicle where the shooting took place.[43]  She testified that after Washington entered the vehicle, the windows of the vehicle erupted, causing her to grab her grandson and run to her daughter's house nearby where she remained for several hours.[44]  After the eruption, Gardner testified to remembering having "glass all in [her] hair."[45]  Moreover, Gardner testified that later on the same evening Washington came to her home to try "to apologize," but she refused to speak with him.

Gardner's eyewitness account that Washington was in the car when the shooting occurred and her testimony that Washington later tried to apologize for the shooting is strong independent evidence of Washington's guilt.  The evidence Washington has proffered (Waterman's recantation, the alleged *Brady* violation, and

---

[42] *Taylor v. State*, 180 A.3d 41 (Del. 2018) (citing *Downes v. State*, 771 A.2d 289, 291 (Del. 2001).

[43] *Washington v. State*, 2011 WL 4908250 (Del. 2011).

[44] *Id.*

[45] *Id.*

Rone's lack of credibility) has no effect on Gardner's testimony and, therefore, would not change the result.

**A. Washington's Motion is Procedurally Barred.**

Under Rule 61(i)(1) and Rule 61(i)(2), Washington's Motion is barred because it is untimely and successive.[46] The Delaware Supreme Court issued its ruling affirming Washington's conviction on October 14, 2011.[47] This second postconviction relief motion was not filed until August of 2019, almost eight years after his conviction was final.[48] Because Washington's motion was filed more than one year after his conviction became final and is his second motion, it is barred. Further, his claims related to an alleged tacit agreement with Fields and to Rhone's qualifications and methodology are barred as not raised previously.

The State filed its motion to reduce Fields' sentence based on his substantial assistance two months after trial, but Washington did not raise this issue in either his direct appeal or his first postconviction relief motion. Washington has not shown cause for his failure to raise this claim previously, nor as discussed below, has he established actual prejudice from the claimed *Brady* violation.

Washington did not object to Rone's credentials or methodology at trial. And, as with his claimed *Brady* violation, he did not raise this claim in his direct appeal

---

[46] Super. Ct. Crim. R. 61(i)(1)-(2).
[47] *Washington v. State*, 2011 WL 4908250 (Del. 2011).
[48] Def.'s Second Mot. for Postconviction Relief, at 1, D.I. 173.

or his first conviction relief motion. The issue was available to him since many of the cases and materials upon which he relies predate either his direct appeal or the resolution of his first postconviction relief motion. Again, Washington has failed to show cause for his failure to raise this issue previously, or as discussed below, prejudice.

**B. Washington's Claims Do Not Overcome Rule 61's Bars to Relief.**

Washington argues he has overcome the procedural defaults in Rule 61 because the evidence he is presenting is "new" and "creates a strong inference that [he] is actually innocent[.]"[49] To prove actual innocence, Washington must satisfy the heavy burden of showing any newly discovered evidence "(a) will probably change the result if a new trial is granted; (b) was discovered since the trial and could not have been discovered before by the exercise of due diligence; and (c) is not merely cumulative or impeaching."[50] Washington specifically claims: (1) Waterman recanted his testimony; (2) Fields received a sentence reduction pursuant to an undisclosed tacit agreement with the State, constituting a *Brady* violation; and (3) Rone misled jury by misrepresenting his credentials and using subjective and

---

[49] Super. Ct. Crim. R. 61(d)(2)(i).
[50] *Taylor v. State*, 180 A.3d 41 (Del. 2018) (citing *Downes v. State*, 771 A.2d 289, 291 (Del. 2001).

unreliable identification methods.[51]  The proffered evidence does not satisfy the actual innocence requirement.

### 1. Waterman's' Recantation

Evidence of Waterman's recantation fails to meet the heavy burden of Rule 61.  Washington's conviction was upheld on direct appeal on October 14, 2011.[52]  This motion was not filed until August 30, 2019.[53]  Delaware courts generally view applications based on a witness' recantation with suspicion.[54]  The Delaware Supreme Court has held also that if recantations were "products of prison atmosphere [they are] to be received with great caution."[55]

Here, Washington asserts that Waterman's recantation of his testimony would "likely" change the outcome of the judgment.[56]  Waterman signed an affidavit stating his testimony was false and that Washington never admitted committing the killings to him.[57]  Further, Waterman states that he made up this testimony to get a sentence reduction for his prison term.[58]  Waterman claims his false testimony was based on rumors and the conversations of other inmates.[59]

---

[51] Def.'s Second Mot. for Postconviction Relief, at 12, D.I. 173.
[52] *Washington v. State*,  2011 WL 4908250 (Del. 2011).
[53] *Taylor v. State*, 180 A.3d 41 (Del. 2018).
[54] *Blankenship v. State*, 447 A.2d 428, 433 (Del. 1982).
[55] *Id.* at 434 (citing *Johnson v. State*, 410 A.2d 1014, 1015 (Del. 1980)).
[56] Def's Second Mot. for Postconviction Relief, at 26, D.I. 173.
[57] *Id*, at 24 (citing Waterman's Aff. A252).
[58] *Id.*
[59] *Id.*

Waterman's recantation would not "probably change the result if a new trial is granted[.]"[60] Waterman testified during trial that Washington admitted guilt to him personally, but in Waterman's affidavit he states that he heard from other inmates that Washington committed the crime. Waterman's recantation must be viewed with suspicion.[61] But even if the Court were to accept it at face value, it does not provide new evidence that a person other than Washington committed the crime, nor does it establish that no reasonable jury would have found Washington guilty beyond a reasonable doubt. Far from establishing that someone other than Washington committed the crimes, it shows that Washington was rumored to be the killer. If Waterman's affidavit is to be believed, it merely eliminates him as a witness, but does not challenge the factual accuracy of the rumors. Nor does it challenge the other independent, significant testimony from Fields and Coleman that Washington incriminated himself to them.[62] Most importantly, it does not challenge Gardner's eyewitness testimony that she saw Washington enter the vehicle in which the Francis and Guy were killed moments before its windows "erupted" and that he

---

[60] *Taylor v. State*, 180 A.3d 41 (Del. 2018) (citing *Downes v. State*, 771 A.2d 289, 291 (Del. 2001).
[61] *Blankenship v. State*, 447 A.2d 428, 433 (Del. 1982).
[62] Def.'s Second Mot. for Postconviction Relief, at 13-17, D.I. 173.

later attempted to "apologize."[63]   The recantation merely impeaches Waterman's trial testimony and does not constitute new evidence that proves actual innocence.[64]

### 2. Alleged *Brady* Violation

Washington does not provide any evidence that an agreement existed between the State and Fields, tacit or otherwise, at the time of trial.  Thus, he has failed to establish a *Brady* violation.  Furthermore, even if such a tacit agreement existed, it is insufficient to establish the actual innocence.

In *Brady v. Maryland*, the United States Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[65]  Failure to produce impeachment or exculpatory evidence that is material to the case can constitute a *Brady* violation.[66] A *Brady* violation consists of three parts: "(1) evidence exists that is favorable to the accused, because it is either exculpatory or impeaching; (2) that evidence is suppressed by the State; and (3) its suppression prejudices the defendant."[67]   A defendant must show that the State's nondisclosure created "a *reasonable*

---

[63] *Id.* at 17-18.

[64] *Taylor v. State*, 180 A.3d 41 (Del. 2018) (citing *Downes v. State*, 771 A.2d 289, 291 (Del. 2001).

[65] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[66] *Wright v. State*, 91 A.3d 972, 987 (Del. 2014) (citing *Bagley*, 473 U.S. 667, 676 (1985)).

[67] *Id.* at 988 (citing *Starling v. State*, 882 A.2d 747 (Del. 2005)).

*probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[68] Furthermore, reasonable probability of a different outcome occurs when the evidence presented "undermines confidence in the outcome of the trial."[69]

Here, Washington asserts that the State did not disclose a tacit sentence reduction agreement it had with Isaiah Fields.[70] Washington contends that the State's motion to reduce Fields' sentence based on his substantial assistance in prosecuting Washington is evidence that an undisclosed tacit agreement existed at the time of his trial.[71] That motion was filed and granted in January of 2011, two months after the conclusion of Washington's trial, but before his sentencing.[72]

Washington has presented no real evidence that an agreement between the State and Fields existed at the time of trial, he merely infers the existence of such an agreement. In fact, the prosecutor expressly stated that there was no such agreement.[73] Even if a tacit agreement existed at the time of trial, such an agreement does not constitute as a *Brady* violation, because Washington was not prejudiced. Independent, significant incriminating evidence existed to convict Washington, and

---

[68] *Id.*
[69] *Id.* (citing *Bagley*, 667 U.S. at 678).
[70] Def.'s Second Mot. for Postconviction Relief, at 12, D.I. 173.
[71] *Id.*, at 27.
[72] *Id.*
[73] Tr. Oct. 27, 2010, at 10.

the alleged tacit agreement constitutes, at best, only theoretical *de minimis* prejudice to Washington. Put differently, this tacit agreement is merely impeachment evidence and does not create a reasonable probability that a different outcome would occur, especially in light of testimony from both Gardner and Coleman.[74] Further, it is insufficient to create an inference of actual innocence under to Rule 61(d)(2)(i) or *Purnell*.

### 3. Carl Rone

The evidence presented regarding Carl Rone's credibility and his methodology does not constitute "new" evidence under Rule 61 and does not create a strong inference that, if retried, the outcome of a new trial would be different. Washington asserts that Rone's credibility is in question because of his 2018 guilty plea to crimes he committed in 2016 and 2017 and that the Delaware Supreme Court's decision in *Fowler v. State*[75] supports his request for a new trial.[76] Washington argues Rone's testimony was critical in determining guilt because Rone presented evidence tying the gun used at 930 Spruce Street to the gun used in the homicides.[77] Further, Rone misled the jury when he incorrectly represented his certification with the Association of Firearm and Toolmark Examiners ("AFTE") at

---

[74] *Wright*, 91 A.3d at 988.
[75] 194 A.3d 16 (Del. 2018).
[76] Def.'s Second Mot. for Postconviction Relief, at 33-34, D.I. 173.
[77] *Id.* at 33-34.

the time of trial.[78]  Finally, Washington asserts the methods used by Rone are unreliable.[79]

Washington expends a great deal of energy discussing the fallout from Rone's subsequent criminal conduct in cases in which Rone had testified for the State, his misrepresentation of his credentials, and the deficiencies in his methodology in making ballistics identifications.  But he fails to address the significance of Rone's testimony in the context of the defense theory of the case.  Rone's testimony connecting the firearm used at 930 Spruce Street to the firearm used in the homicide was not contested by the defense.  He was not cross-examined on that connection and Washington did not argue that the firearm used at 930 Spruce Street was a different firearm than the one used in the vehicle where the shootings took place.  Specifically, Washington testified at trial that while present at 930 Spruce Street, he observed Michael Fields with this firearm "looking at it, … playing with it back and forth and the gun just went off in the floor into the wall[.]"[80]  Washington further testified, "next time I seen that gun was the day of the shooting accident."[81]  Washington testified that on that date – September 1st – he gave to gun to Kareem Bay who was interested in buying it.[82]  Since the ballistics match was not an issue

---

[78] Id. at 51-52.

[79] Id. at 39.

[80] Tr., Nov. 3, 2010, Michael Washington Direct Examination, at 88.

[81] *Id.,* at 89.

[82] *Id.,* at 92, 94.

contested by Washington, Rone's testimony connecting the firearm used at 930 Spruce to the one used in the homicides was not crucial in determining guilt.

While Rone's opinion testimony was not disputed on the issue of whether the same gun was involved in the shooting at 930 Spruce Street and the homicides, it was disputed on the issue of whether the gun was an automatic or semi-automatic firearm. He was cross-examined on that point almost exclusively.[83] In summation, defense counsel framed the dispute this way: "The issue – the issue is, was it automatic fire or semi-automatic fire."[84] The issue arose because, as defense counsel put it, "If it's – if- the State doesn't want automatic fire, cause automatic fire puts you in the accident category. This thing took off."[85] Rone had opined that the weapon was a semi-automatic weapon requiring a separate trigger pull for each shot, whereas the defense expert said it was automatic fire, requiring only a single trigger pull.[86] The difference reflected the shooter's state of mind. Thus, a semi-automatic weapon, requiring 30 separate trigger pulls, indicated intentional first degree murders. An automatic weapon indicated reckless or criminally negligent killings, requiring verdicts of manslaughter or criminally negligent homicide. By its verdicts of manslaughter, the jury rejected the only opinion of Rone's that Washington

---

[83] Tr., Nov. 1. 2010, Carl Rone Cross-Examination, at 65-104.
[84] Tr., Nov. 9, 2010, Defense Summation, at 110-111.
[85] *Id.,* at 111.
[86] *Id.,* 111-114, 125                                    .

contested. When put in its proper context, Rone's testimony did not materially contribute to the jury finding Washington guilty. Washington's complaints about Rone do not create a strong inference of actual innocence sufficient to overcome Rule 61(d)(2)(i)'s procedural bars because they are merely impeachment evidence on a collateral issue and do not create a strong inference that the outcome probably would be different if presented to a jury.

Additionally, Rone's testimony was not central to Washington's conviction because other more significant evidence supported the jury's verdict. Gardner's eyewitness testimony observing Washington enter the vehicle moments before the shooting and her testimony that Washington later tried to apologize is significant, independent incriminating evidence of guilt, as is Coleman's additional incriminating testimony that Washington killed Francis and Guy.

Washington claims that he is entitled to a new trial under *Fowler v. State*.[87] However, his case is procedurally and substantively different from *Fowler*. Procedurally, *Fowler* involved a first postconviction relief motion, which did not require Fowler to establish his actual innocence.[88] Substantively, in *Fowler*, Rone's tainted testimony was crucial for a finding of guilt, especially where the State had not provided the defense with out of court witness statements in violation of its

---

[87] *Fowler v. State*, 194 A.3d 16 (Del. 2018).
[88] *Id. See also*, Purnell v. State, 254 A.3d 1053, 1100 (Del. 2021).

*Jencks* obligations. Here, independent, significant, untainted incriminating evidence was present for the jury to consider.

Washington's case is more akin to *Dixon v. State*.[89]  The Delaware Supreme Court upheld Dixon's conviction after he filed a second motion for postconviction relief.[90]  The Supreme Court distinguished *Dixon* from *Fowler* both substantively and procedurally.  In *Dixon*, the court held "the key evidence the State used to prove that Dixon was the shooter, other than that offered by Rone, was admissible…"[91]  Procedurally, both in *Dixon* and here, the second motions for postconviction relief require proof of actual innocence.

Washington's reliance on Rone's misrepresentation of his credentials during trial is insufficient to meet the burden of Rule 61.  Rone's misrepresentation of his certification with AFTE does not constitute new evidence of actual innocence because it was available at the time of trial and discoverable with due diligence.  Moreover, the evidence is nothing more than insubstantial impeachment evidence.[92]

To the extent that it matters, the attack on Rone's methodology does not constitute new evidence of actual innocence under Rule 61.  In his motion, Washington relies on a 2009 National Academy of Science report to contest Rone's

---

[89] *Dixon v. State*, No. 319, 2020, 2021 WL 3404223, at *1 (Del. Aug. 4, 2021).
[90] *Id.*
[91]*Id*.
[92] *See, Taylor v. State,* 180 A.3d 41 (Del. 2018) (citing *Downes v. State,* 771 A.2d 289, 291 (Del. 2001).

methodology. This report was available in 2010 at the time of Washington's trial and therefore, does not constitute newly discovered evidence. Washington had the opportunity to contest the subjective nature of Rone's analysis at trial but did not.[93] Washington also relies on a 2016 President's Council of Advisors on Science and Technology report. While this report was unavailable at trial, it is merely cumulative impeachment evidence and does not create a strong inference of actual innocence. It is not reasonable to believe that, had this evidence regarding Rone's methodology been presented at trial, the probable result would have been different.

### 4. Cumulative Effect

Apparently shifting gears, Washington concedes in his Reply to the State's response that "[a]ny of the claims standing alone would be insufficient to satisfy the 'daunting burden' established in *Purnell* for overcoming the procedural bar based on actual innocence."[94] The Court agrees, but even cumulatively, the evidence is insufficient to establish actual innocence under Rule 61. None of Washington's claims, individually or cumulatively, point to anyone else as the perpetrator and none of them undermine the strong incriminating evidence provided by Gardner and

---

[93] *See Dixon v. State*, No. 319, 2020, 2021 WL 3404223, at *4 (Del. Aug. 4, 2021).
[94] Def.'s Reply to State's Response, at 12, D.I 197.

Coleman. There is no reason to believe that they would "probably change" the outcome if presented to a jury.[95]

## C. CONCLUSION

For the foregoing reasons, Washington's Motion for Postconviction Relief is **DENIED.**

**IT IS SO ORDERED.**

/s/ *Ferris W. Wharton*
Ferris W. Wharton, J.

---

[95] *Taylor v. State*, 180 A.3d 41 (Del. 2018) (citing *Downes v. State*, 771 A.2d 289, 291 (Del. 2001).